# 24-253-cv

# United States Court of Appeals

*for the*

# Second Circuit

JOSEPH ZAPPIA, individually and on behalf of all others similarly situated,

*Plaintiff-Appellant,*

– v. –

MYOVANT SCIENCES LTD., MYOVANT SCIENCES, INC., SUMITOMO
PHARMA AMERICA, INC., TERRIE CURRAN, MARK GUINAN, DAVID
MAREK, NANCY VALENTE, MATTHEW LANG,

*Defendants-Appellees.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## PLAINTIFF-APPELLANT

JOSHUA M. RUBIN
WEISS LAW
305 Broadway, 7th Floor
New York, New York 10007
(212) 682-3025

– and –

MICHAEL A. ROGOVIN
WEISS LAW
476 Hardendorf Avenue, NE
Atlanta, Georgia 30307
(404) 692-7910

JOSHUA E. FRUCHTER
WOHL & FRUCHTER LLP
25 Robert Pitt Drive, Suite 209G
Monsey, New York 10952
(845) 290-6818

*Attorneys for Plaintiff-Appellant*

 COUNSEL PRESS    (800) 4-APPEAL • (327917)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ........................................................................iv

INTRODUCTION ...................................................................................1

JURISDICTION.......................................................................................5

ISSUES PRESENTED.............................................................................5

STATEMENT OF THE CASE.................................................................7

A.    Factual Background .....................................................................7

      1.    The Sumitomo Group *Keiretsu* is a Cohesive Network of Japanese Entities That Share a 400-Year Old History and Collaborate on Numerous Business Matters ........................................7

      2.    After Sumitovant and Sumitomo Pharma Propose Acquiring Myovant, the Myovant Board Forms a Special Committee ...............10

      3.    The Special Committee Retains Cooley as its Legal Advisor, But Then Abruptly Drops Cooley for Skadden Without Adequately Vetting Skadden for Potential Conflicts .........................11

      4.    When It Was Retained by the Special Committee, Skadden Had Longstanding and Ongoing Client Relationships With Sumitomo Banking and Other Sumitomo Group Members ...............12

      5.    While Being Advised by Skadden, the Special Committee Decides Not to Solicit Competing Bids ...............................................14

      6.    While Being Advised by Skadden, the Special Committee Squanders an Opportunity to Secure a Competing Bid From Company "A" ........................................................................................15

      7.    In the Absence of Competing Bids, Sumitovant and Sumitomo Pharma Successfully Pressure the Special Committee to Accept a Best and Final Offer of $27.00 Per Share ..............................................16

      8.    Defendants File a Proxy Affirmatively Touting Skadden's "Independence" and "Absence of Conflicts" ......................................19

B.    Relevant Procedural History and Rulings Below .........................................20

i

SUMMARY OF ARGUMENT ..............................................................22

STANDARDS OF REVIEW ..............................................................28

ARGUMENT ....................................................................................29

I.    Plaintiff Adequately Alleges Material Misstatements and Omissions Based on Defendants' Failure to Disclose Skadden's Sumitomo Group Engagements in the Proxy ..................................................29

    A.    Alleged Misstatements and Omissions Should Not be Dismissed as Immaterial Unless They Are "So Obviously Unimportant" to a Reasonable Investor ...............................29

    B.    Because the Proxy Affirmatively Touted Skadden's "Independence" and "Absence of Conflicts," Reasonable Myovant Minority Shareholders Would Have Deemed it Important to Know About the Sumitomo Group Engagements When Voting ...................................................................30

    C.    The District Court Erred When It Concluded That Defendants Were Not Obligated to Disclose Skadden's Sumitomo Group Engagements in the Proxy ..................................................33

        1.    The District Court Inaptly Cited a Second Circuit Case Addressing Disqualification as Authority to Establish Disclosure Standards for Proxies ...............................34

        2.    The District Court Improperly Disregarded Virtually All of Plaintiff's Allegations Concerning the Deep Ties Between Members of the Sumitomo Group *Keiretsu*.............36

        3.    The District Court Improperly Disregarded Allegations Establishing the Plausibility of Skadden's Motivations and Their Impact on the Adequacy of the Sales Price .............39

            (a)    Minority Shareholders Plausibly Might Have Perceived That the Sumitomo Group Engagements Rendered Skadden Less Motivated to Encourage Competing Bids .......................................40

            (b)    Minority Shareholders Plausibly Might Have Perceived That Skadden's Advice at the Competing Bid Meetings Caused the Special Committee Not to Solicit Competing Bids......................41

(c)    Minority Shareholders Plausibly Might Have Perceived That the Special Committee's Failure to Solicit Competing Bids (While Advised by Skadden) Depressed the Sales Price .............................. 44

4.    The District Court Misconstrued *Wilson* ................................. 46

II.   Public Availability of Information From Third Parties Concerning Skadden's Sumitomo Group Engagements Did Not Excuse Nondisclosure of Those Engagements in the Proxy ..................................... 50

III.   Plaintiff Adequately Alleges That the Proxy's Failure to Disclose Skadden's Sumitomo Group Engagements Was Negligent.......................... 55

IV.   If the Court Affirms Based on Pleading Deficiencies, It Should Amend the Judgment to Provide for Dismissal Without Prejudice, and Direct the District Court to Grant Plaintiff Leave to Replead ................ 58

CONCLUSION ..................................................................................... 59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Allen v. Harvey*,
  2023 WL 7122641 (Del. Ch. Oct. 30, 2023)................................................. 31, 49

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co*.,
  19 F.4th 145 (2d Cir. 2021) ............................................................................29

*APP Grp. (Canada) Inc. v. Rudsak USA Inc*.,
  2024 WL 89120 (2d Cir. Jan. 9, 2024)......................................................... 28, 59

*Atl. Recording Corp. v. Project Playlist, Inc*.,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009)............................................................37

*Baum v. Harman Int'l Indus., Inc.*,
  408 F. Supp. 3d 70 (D. Conn. 2019) ............................................................55

*Baum v. Harman Int'l Indus., Inc*.,
  575 F. Supp. 3d 289 (D. Conn. 2021) ...........................................................33

*Christine Asia Co. v. Ma*,
  718 F. App'x 20 (2d Cir. 2017)................................................................... 36, 39

*City of Dearborn Police & Fire Revised Ret. Sys. v.
  Brookfield Asset Mgmt. Inc*.,
  2024 WL 1244032 (Del. Mar. 25, 2024)....................................................... *passim*

*Dekalb Cnty. Pension Fund v. Transocean Ltd*.,
  817 F.3d 393 (2d Cir. 2016) ..........................................................................55

*Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*,
  2021 WL 4443258 (S.D.N.Y. Sept. 27, 2021) ................................. 28, 29, 30, 56

*Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc*.,
  268 F. Supp. 3d 526 (S.D.N.Y. 2017) ...........................................................55

*Goldstein v. Denner*,
  2022 WL 1671006 (Del. Ch. May 26, 2022) ............................................. 30, 53

*Gov't of India v. Cook Indus., Inc*.,
  569 F.2d 737 (2d Cir. 1978) ..........................................................................35

*GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.*,
  618 F.3d 204 (2d Cir. 2010) ..................................................................... 24, 34

iv

*In re Appraisal of Columbia Pipeline Grp., Inc.*,
2019 WL 3778370 (Del. Ch. Aug. 12, 2019)......................................44

*In re Columbia Pipeline Grp., Merger Litig.*,
299 A.3d 393 (Del. Ch. 2023) ............................................................42

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................52

*In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*,
272 F. Supp. 2d 243 (S.D.N.Y. 2003) .................................................53

*In re Mindbody, Inc., S'holder Litig.*,
2023 WL 2518149 (Del. Ch. Mar. 15, 2023) ......................................44

*In re PLX Tech. Inc. S'holders Litig.*,
2018 WL 5018535 & n.513 (Del. Ch. Oct. 16, 2018)...................... 31, 32

*In re S. Peru Copper Corp. S'holder Derivative Litig.*,
52 A.3d 761 (Del. Ch. 2011), *aff'd*, 51 A.3d 1213 (Del. 2012)............. 23, 33, 44

*In re Synchrony Fin. Sec. Litig.*,
988 F.3d 157 (2d Cir. 2021) ...............................................................28

*Kahn v. Tremont Corp.*,
694 A.2d 422 (Del. 1997).....................................................................41

*Kas v. Fin. Gen. Bankshares, Inc.*,
796 F.2d 508 (D.C. Cir. 1986) ............................................................35

*Knopf v. Esposito*,
803 F. App'x 448 (2d Cir. 2020)..........................................................28

*Kronfeld v. Trans World Airlines, Inc.*,
832 F.2d 726 (2d Cir. 1987) ...............................................................51

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011) ....................................................... *passim*

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015) ...............................................................59

*Mandala v. NTT Data, Inc.*,
88 F.4th 353 (2d Cir. 2023)........................................................ 58, 59

*Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc.*,
824 A.2d 11 (Del. Ch. 2002) ...............................................................30

v

*Mockingbird 38, LLC v. Int'l Bus. Times, Inc.*,
  2022 WL 154137 & n.4 (S.D.N.Y. Jan. 18, 2022)................................37

*Morrison v. Berry*,
  191 A.3d 268 (Del. 2018)..................................................................23

*New England Carpenters Guaranteed Annuity & Pension Funds v.
  DeCarlo*,
  80 F.4th 158 (2d Cir. 2023)..............................................................28

*New Jersey Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013) ........................................................ 51, 54

*Shaev v. Saper*,
  320 F.3d 373 (3d Cir. 2003) ........................................................ 52, 53

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
  551 U.S. 308 (2007) ........................................................................38

*To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc.*,
  152 F.3d 658 (7th Cir. 1998) ..........................................................38

*Trump v. Vance*,
  977 F.3d 198 (2d Cir. 2020) ............................................................37

*TSC Indus. v. Northway*,
  426 U.S. 438 (1976) ........................................................ 29, 35, 53, 54

*Tseng v. De Vries*,
  2023 WL 8073087 (2d Cir. Nov. 21, 2023) ......................................56

*United Paperworkers Int'l Union v. Int'l Paper Co.*,
  985 F.2d 1190 (2d Cir. 1993) ..................................................... 26, 51, 52

*Virginia Bankshares, Inc. v. Sandberg*,
  501 U.S. 1083 (1991) ......................................................................53

*Wilson v. Great Am. Indus., Inc.*,
  855 F.2d 987 (2d Cir. 1988) .................................................... *passim*

*Zappia v. Myovant Sciences, Ltd.*,
  2023 WL 8945267 (S.D.N.Y. Dec. 28, 2023)......................................7

*Zenith Radio Corp. v. United States*,
  606 F. Supp. 695 (Ct. Int'l Trade 1985), *aff'd*,
  783 F.2d 184 (Fed. Cir. 1986) ........................................................48

*Zervos v. Verizon N.Y., Inc.*,
  252 F.3d 163 (2d Cir. 2001) ...................................................................28

**Statutes & Other Authorities:**

15 U.S.C. § 78n(a) ...................................................... *passim*

17 C.F.R. § 240.14a-9(a) ............................................ *passim*

28 U.S.C. § 1291 .............................................................5

28 U.S.C. § 1331 .............................................................5

Fed. R. Civ. P. 8(a)........................................................28

Fed. R. Civ. P. 12(b)(6)..................................................28

Fed. R. Civ. P. 15(a)(2)...............................................6, 58

Artur F. Tomeczek, *The evolution of Japanese keiretsu networks: A
  review and text network analysis of their perceptions in economics*,
  JAPAN AND THE WORLD ECONOMY, Vol. 62 (2022) ..........................7, 8

## **INTRODUCTION**

Defendants distributed a proxy soliciting Plaintiff and other minority shareholders to approve the sale of Defendant Myovant to its majority corporate shareholders. To increase voter confidence, the proxy asserted that Skadden—the law firm representing the minority's interests—had no conflicts and was "independent," *i.e.*, not subject to any influences that might undermine Skadden's allegiance to the minority. But those assertions were false: while representing the minority's interests, Skadden was concurrently representing entities linked to the majority shareholders via a Japanese network known as the Sumitomo Group *keiretsu*, and thus subject to influences that might impair its loyalty to the minority.

This appeal asks whether the federal securities laws obligated Defendants to disclose Skadden's Sumitomo Group Engagements in the proxy. On the record below, and under this Court's precedent, the answer is yes—given that the proxy affirmatively touted Skadden's "independence" and lack of conflicts, reasonable minority shareholders (when deciding how to vote) would have deemed it important to know about any relationships like the Sumitomo Group Engagements that might have impaired Skadden's advocacy.

By way of background, Defendant Myovant was a drug manufacturer owned approximately 48% by minority public shareholders, and 52% by Sumitovant. In turn, Sumitovant is 100% owned by Sumitomo Pharma, which is 51.76% owned by

1

Sumitomo Chemical.

Both Sumitomo Pharma and Sumitomo Chemical are members of the Sumitomo Group *keiretsu*, a form of business network unique to Japan. Like other *keiretsu*, the Sumitomo Group features a member bank—Sumitomo Banking—that loans funds to other members. Sumitomo Group members also share a 400-year old history, jointly pursue business opportunities, and coordinate their public relations. In sum, the Sumitomo Group is a cohesive conglomerate-like network of entities that collaborate across multiple areas.

One such collaboration was the buyout of Myovant. In October 2022, Myovant announced that Sumitovant had agreed to pay $27.00 per share in cash to acquire the minority interest in Myovant. The acquisition was (i) financed by a $1.7 billion loan from the Sumitomo Group's member bank—Sumitomo Banking—to fellow Sumitomo Group member Sumitomo Pharma, and (ii) negotiated by Sumitomo Pharma and Sumitovant with a Special Committee of the Myovant Board formed to represent the interests of Myovant's minority shareholders.

In January 2023, Defendants distributed a final proxy ("Proxy") soliciting minority shareholders to approve the proposed sale. As part of its pitch, the Proxy asserted that Skadden—the Special Committee's law firm—was "independent" and had no conflicts. In fact, Skadden had undisclosed potential conflicts that "might be perceived" to have impaired its loyalty to the minority—while representing the

minority's interests in negotiations *against* Sumitovant and Sumitomo Pharma over the Myovant deal financed by Sumitomo Banking, Skadden was concurrently representing (and had previously represented) Sumitomo Banking and other Sumitomo Group members in other substantial legal matters ("Sumitomo Group Engagements"). *See Wilson v. Great Am. Indus., Inc*., 855 F.2d 987, 994 (2d Cir. 1988) (formulating "might be perceived" test to determine when proxies must disclose potential sell-side law firm conflicts arising from unrelated matters).

In particular, the Sumitomo Group Engagements might be perceived to have impaired Skadden's advocacy at two crucial meetings in August and October 2022 ("Competing Bid Meetings"). At those meetings, Skadden, the Special Committee, and the Special Committee's financial advisor (Goldman), discussed whether to solicit competing bids from other companies that might be willing to pay more for Myovant than Sumitovant and Sumitomo Pharma. As a result of those discussions, the Special Committee determined *not* to solicit competing bids, and later declined to meaningfully engage with another potential bidder that expressed interest in acquiring Myovant. Those choices sharply diminished the Special Committee's negotiating leverage by leaving it with no options to pressure Sumitovant and Sumitomo Pharma to raise their so-called "best and final offer."

Reasonable minority shareholders might have perceived that Skadden's Sumitomo Group Engagements rendered Skadden unwilling to advise the Special

Committee to solicit competing bids that might yield a higher sales price because doing so could complicate negotiations, and thus undermine Skadden's good will with Sumitomo Group members (including Sumitomo Banking—Skadden's concurrent client and the Sumitomo Group's most prominent member—which, if a competing bidder emerged, would need to either increase the amount of its loan or lose the financing opportunity). *See City of Dearborn Police & Fire Revised Ret. Sys. v. Brookfield Asset Mgmt. Inc*., 2024 WL 1244032, at *18-19 (Del. Mar. 25, 2024) (representations of buy-side interests can impair a sell-side law firm's advocacy due to incentive to maintain good will with such entities).

Because they raised red flags about the vigor of Skadden's advocacy and the adequacy of the sales price, Skadden's Sumitomo Group Engagements would not have been "so obviously unimportant" to minority shareholders. *Litwin v. Blackstone Grp., L.P*., 634 F.3d 706, 717 (2d Cir. 2011). As such, a disclosure like the following—modeled on Goldman's conflict disclosures (A-753)—should have appeared in the Proxy to enable minority shareholders to "judge for themselves" the significance of those engagements (*Wilson*, 855 F.2d at 994):

> During the two-year period ended October 23, 2022, the Special Committee's law firm, Skadden, has represented members of the Sumitomo Group network of Japan (of which Sumitomo Pharma, and its parent, Sumitomo Chemical, are members) in various legal matters for which it received compensation, including representing: (i) Sumitomo Banking (the bank financing the Merger) in [details], (ii) Sumitomo Nikko in [details], and (iii) Sumitomo Trust in [details].

Despite lacking expertise concerning the significance of *keiretsu* relationships, the District Court held that Defendants were not obligated to disclose Skadden's Sumitomo Group Engagements in the Proxy. In doing so, the District Court applied the wrong legal standards, improperly disregarded numerous allegations in the complaint, and misconstrued *Wilson*. This Court should reverse.

Alternatively, if the Court affirms based on pleading deficiencies, it should direct the District Court to grant Plaintiff leave to replead to cure such deficiencies since Plaintiff decided at oral argument to stand by his allegations without the benefit of any ruling by the District Court or this Court on Defendants' motion to dismiss.

## JURISDICTION

The District Court had jurisdiction under 28 U.S.C. § 1331. On December 29, 2023, it entered final judgment, and on January 24, 2023, Plaintiff timely appealed. This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

**Issue #1:** Under *Wilson*, relationships that "might be perceived" as impairing a sell-side law firm's advocacy constitute potential conflicts that must be disclosed in a proxy. Reasonable Myovant minority shareholders might have perceived that Skadden's Sumitomo Group Engagements impaired Skadden's advocacy. As such, did the District Court err when it held that Defendants were not obligated to disclose the Sumitomo Group Engagements in the Proxy?

5

**Issue #2:** In this Circuit, a company cannot excuse its omission of material facts from a proxy on the ground that such facts were already publicly available to shareholders in sporadic media reports. As such, did the District Court err when it held that nondisclosure of Skadden's Sumitomo Group Engagements in the Proxy was excused because information about those engagements happened to be publicly available in one-off third-party press releases?

**Issue #3:** Under *Wilson*, the distribution of a materially false and misleading proxy is negligent as a matter of law. Because Defendants failed to disclose Skadden's Sumitomo Group Engagements, the Proxy was materially false and misleading. Further, the Proxy reflects that the Special Committee did not vet Skadden for potential conflicts like it vetted its other advisors. As such, did the District Court err when it held that Plaintiff failed to adequately allege negligence?

**Issue #4:** This Court has long declined to treat a plaintiff's decision to stand by its allegations without the benefit of a ruling on a motion to dismiss as a forfeiture of the protections in Federal Rule 15(a)(2) (directing that leave to amend should be freely granted). At oral argument, Plaintiff stood by his allegations without the benefit of any ruling by the District Court or this Court on Defendants' motion to dismiss. As such, if the Court affirms based on pleading deficiencies, should it direct the District Court to grant Plaintiff leave to replead to cure such deficiencies?

## STATEMENT OF THE CASE

Plaintiff asserts claims on behalf of a class of former Myovant minority shareholders against Defendants for disseminating a materially false and misleading proxy that violated Sections 14(a) and 20(a) of the Exchange Act, and SEC Rule 14a-9. (A-63-68; SPA-21-32). On December 28, 2023, the District Court (Rakoff, D.J) granted Defendants' motion to dismiss with prejudice. (SPA-1-19). *See Zappia v. Myovant Sciences, Ltd.*, 2023 WL 8945267 (S.D.N.Y. Dec. 28, 2023).[1]

### A.    Factual Background

### 1.    The Sumitomo Group *Keiretsu* is a Cohesive Network of Japanese Entities That Share a 400-Year Old History and Collaborate on Numerous Business Matters

Sumitovant was a wholly-owned subsidiary of Sumitomo Pharma, which is 51.76% owned by Sumitomo Chemical. (A-12 at ¶4). Both Sumitomo Pharma and Sumitomo Chemical are members of the Sumitomo Group *keiretsu*, a form of business network unique to Japan. (A-12-13 at ¶5 & n.3) (citing Artur F. Tomeczek, *The evolution of Japanese keiretsu networks: A review and text network analysis of their perceptions in economics*, Japan and the World Economy, Vol. 62 (2022) ("Tomeczek Article"); *see* A-814 at 27:20-23 (referencing article)).

---

[1] Citations to: "SPA-" refer to pages in the annexed Special Appendix, and "A-" refer to pages in the Joint Appendix filed herewith. Cross-references to: "Facts A.__" refer to portions of the "Factual Background" section of the Statement of the Case, and "Point" refer to portions of the Argument. All emphasis in quotations is added, and all internal quotation marks and citations are omitted, unless otherwise noted.

Sumitomo Group members are deeply interconnected. (A-803 at 16:5 to A-804 at 17:18; A-820). *First*, they share a 400-year old history, as Sumitovant's successor, Defendant Sumitomo Pharma America, touts on its website: "[o]ur parent company, Sumitomo Pharma . . . is a member of the Sumitomo Group, which has a history of about 400 years." (A-22-23 at ¶28 & n.14; *see also* A-814 at 27:15-20).[2]

*Second*, like other *keiretsu*, the Sumitomo Group features a member bank—Sumitomo Banking—that lends money to other members. (A-13 at ¶5 & n.3) (citing Tomeczek Article). Sumitomo Pharma tapped this shared financing source to borrow $1.7 billion from Sumitomo Banking to acquire Myovant. (A-14 at ¶8; A-414; A-804 at 17:11-15; A-815 at 28:18-20).

*Third*, Sumitomo Group members coordinate their public relations (PR) through the Sumitomo Group Public Affairs Committee ("Sumitomo PAC") to enhance public trust in Sumitomo Group members. (A-13 at ¶5 & n.4; A-820). The Sumitomo PAC's website details the scope of these PR activities at:

https://www.sumitomo.gr.jp/english/committee/message/. (A-13 at ¶5 n.4).

Among these PR activities is a quarterly newsletter that senior executives of Sumitomo Group members—including the Presidents of Sumitomo Banking and Sumitomo Chemical—use as a communication tool. (A-25 at ¶40). The Sumitomo

---

[2] The transcript has an error. The attorney at 27:15 on A-814 should be "Mr. Fruchter," not "Mr. Feldman."

PAC's website provides access to past newsletters at:

https://www.sumitomo.gr.jp/english/committee/public-relations/quarterly/ (A-13 at

¶5 n.4). A list of Sumitomo PAC members is available at:

https://www.sumitomo.gr.jp/english/org/company/. (A-12-13 at ¶5 n.2).

*Fourth*, Sumitomo Group members collaborate on business ventures. (A-820).

For example, on July 14, 2021, Sumitomo Group members Sumitomo Banking and

Sumitomo Nikko, and an affiliate, announced a strategic alliance with Jefferies

under which, *inter alia*, (i) Sumitomo Banking agreed to provide $2.25 billion in

financing to Jefferies, and (ii) Sumitomo Banking, Sumitomo Nikko and the affiliate

agreed to collaborate with Jefferies on corporate and investment banking

opportunities, and to acquire up to 4.9% of Jefferies' common stock. (A-15 at ¶11

& n.7) ("Initial Jefferies Alliance"). On April 27, 2023, Sumitomo Banking,

Sumitomo Nikko and their affiliates announced an expansion of the Initial Jefferies

Alliance to new collaborations, and an increase in Sumitomo Banking's interest in

Jefferies to up to 15%. (A-15 at ¶10 & n.6) ("Expanded Jefferies Alliance").

*Fifth*, like other *keiretsu*, the Sumitomo Group features cross-shareholdings.

(A-820). Some are considerably large; as noted, Sumitomo Chemical owns 51.76%

of Sumitomo Pharma. (A-12 at ¶4). Other cross-shareholdings are much smaller:

Sumitomo Life owns 4.34%, and Sumitomo Banking owns 1.4%, of Sumitomo

Chemical. (A-14 at ¶8; A-16 at ¶13; A-17 at ¶14 n.11).

*Sixth*, Sumitomo Group members underwrite the securities of other Sumitomo Group members. (A-820). For example, in May 2021, Sumitomo Nikko participated in the underwriting of $920 million of notes issued by Sumitomo Group member Sumitomo Life Insurance Company. (A-17 at ¶15 n.12; A-803 at 16:12-14).

### 2. After Sumitovant and Sumitomo Pharma Propose Acquiring Myovant, the Myovant Board Forms a Special Committee

In December 2019, Sumitovant acquired a majority of Myovant's shares. (A-27 at ¶52). In April 2022, Sumitovant and Sumitomo Pharma wrote to Myovant's Board requesting due diligence in anticipation of a proposal to acquire the minority interest. (A-27 at ¶53). The letter advised that any transaction must be approved by a majority of minority shareholders. (*Id.*).

Sumitovant had three representatives on Myovant's Board. (A-25 at ¶¶41-43). On April 28, 2022—to neutralize any conflicts when evaluating the anticipated proposal—the Board formed the Special Committee (comprised of Defendants Guinan, Curran and Valente). (A-23 at ¶¶29-31; A-28 at ¶54). The Special Committee was empowered not only to evaluate any proposals from Sumitovant and Sumitomo Pharma, but also to "evaluate *available alternatives*," and to recommend to the Board what actions to take regarding "a potential transaction with Sumitovant *or any alternative thereto*." (A-28 at ¶54).

### 3. The Special Committee Retains Cooley as its Legal Advisor, But Then Abruptly Drops Cooley for Skadden Without Adequately Vetting Skadden for Potential Conflicts

On April 28, 2022, the Special Committee met with Myovant management and Cooley (Myovant's outside counsel) to discuss retaining "a financial advisor and counsel for the Special Committee." (A-379). The Proxy relates that "*following discussion (including* review of the proposed forms of engagement letters with such advisors *and disclosures regarding any potential conflicts of interest* such advisors may have with respect to a potential transaction involving Sumitovant)," the Special Committee determined that Cooley and Goldman "were not disqualified from being engaged by the Special Committee by virtue of any potential conflicts of interest," and retained them. (A-379-380).

On June 28, 2022, the Special Committee abruptly dropped Cooley and retained Skadden. (A-380). The Proxy reflects that, unlike it did when vetting Cooley, the Special Committee did *not* meet with Skadden to discuss and review (i) a proposed form of engagement letter, and (ii) any disclosures regarding any potential conflicts Skadden may have, before concluding that Skadden had no potential conflicts:

> On June 28, 2022, the Special Committee [met] with members of Myovant's management and . . . Goldman Sachs and Skadden . . . *Prior to representatives of Goldman Sachs and Skadden joining the meeting*, the Special Committee determined to retain Skadden to serve as counsel to the Special Committee, based on, among other things . . . *the absence of conflicts on the part of Skadden*. (A-380).

11

The Proxy explains that the Special Committee dropped Cooley for Skadden "based on Skadden's qualifications, experience and reputation" in providing legal advice concerning the type of transaction that Sumitovant and Sumitomo Pharma contemplated. (A-30 at ¶59; A-380). That rationale is suspect because, as the District Court observed, Cooley also had the "qualifications, experience and reputation" to represent the Special Committee. (A-809 at 22:20-25; A-810 at 23:17 to A-811 at 24:11). That experience included a 2018 representation—akin to the representation here—in which Cooley advised the "*special committee* of the board of directors of Crown Bioscience International, *a global drug discovery and development services company* on its merger agreement *with JSR Corporation, headquartered in Tokyo, Japan.*" (A-30 at ¶59). Accordingly, the abrupt substitution of Skadden for Cooley was a red flag. (*Id.*).

### 4. When It Was Retained by the Special Committee, Skadden Had Longstanding and Ongoing Client Relationships With Sumitomo Banking and Other Sumitomo Group Members

When it was retained by the Special Committee, Skadden was concurrently representing (and had long previously represented) Sumitomo Banking and other Sumitomo Group members in several substantial legal matters. *First*, on March 30, 2020, Ares Management announced a strategic collaboration with Sumitomo Banking under which Sumitomo Banking agreed to invest $384 million in Ares. *Skadden represented Sumitomo Banking.* (A-17 at ¶15 n.12).

*Second*, on May 18, 2021, Sumitomo Life consummated an offering of $920 million in subordinated notes. *Skadden represented Sumitomo Nikko and other underwriters.* (A-17 at ¶15 n.12; A-803 at 16:12-14; A-820).

*Third*, on July 14, 2021, Sumitomo Group members Sumitomo Banking and Sumitomo Nikko announced the Initial Jefferies Alliance. (Facts A.1 above). *Skadden represented Sumitomo Banking and Sumitomo Nikko*. (A-15 at ¶11 & n.7).

*Fourth*, on June 28, 2022—the same day that the Special Committee retained Skadden—Marathon Capital announced a collaboration with Sumitomo Banking to provide joint clients with energy-related services. Sumitomo Banking also agreed to invest in Marathon Capital. *Skadden represented Sumitomo Banking*. (A-16 at ¶12 & n.8).

*Fifth*, on July 6, 2022—just over a week after the Special Committee retained Skadden—Apollo and Sumitomo Group member Sumitomo Trust announced a strategic partnership under which Sumitomo Trust committed to invest $1.5 billion alongside Apollo in a portfolio of alternative assets. *Skadden represented Sumitomo Trust*. (A-16 at ¶13 & n.9).

*Sixth*, on October 12, 2022—while negotiations over the proposed sale of Myovant remained pending—Socionext completed its IPO on the Tokyo Stock Exchange. *Skadden represented Sumitomo Nikko in its role as the IPO's international joint lead manager*. (A-16-17 at ¶14 & n.11).

*Seventh*, on April 27, 2023—less than two months after the Myovant sale closed—Sumitomo Banking and Sumitomo Nikko announced the Expanded Jefferies Alliance. (Facts A.1). *Skadden represented Sumitomo Banking and Sumitomo Nikko*. (A-15 at ¶10 & n.6).

### 5. While Being Advised by Skadden, the Special Committee Decides Not to Solicit Competing Bids

On August 22, 2022, the first Competing Bid Meeting was held. (A-36 at ¶70). Empowered to consider alternatives to a sale of Myovant to Sumitovant and Sumitomo Pharma (A-28 at ¶54), the Special Committee met with Skadden and Goldman to discuss "the possibility of conducting outreach to potential third parties other than Sumitovant in advance of receiving a proposal from Sumitovant." (A-36 at ¶70). At that time, Skadden had previously represented, and was concurrently representing Sumitomo Banking and other Sumitomo Group members in substantial legal matters. (Facts A.4).

After meeting with Skadden and Goldman, the Special Committee decided *not* to exercise its power to solicit competing bids, citing justifications that reasonable minority shareholders might have perceived as pretextual and colored by Skadden's conflicts. (A-36-40 at ¶¶70-75; Point I.C.3.b below). In particular, none of the reasons cited for not soliciting competing bids justified the Special Committee's subsequent failure to meaningfully engage with a potential competing

bidder that reached out after Sumitovant's proposal to acquire Myovant became public. (Facts A.6 below).

### 6. While Being Advised by Skadden, the Special Committee Squanders an Opportunity to Secure a Competing Bid From Company "A"

On September 30, 2022, Sumitovant submitted a private bid to acquire Myovant for $22.75 per share. (A-43 at ¶84). Two days later, on October 2, 2022, the Special Committee held the second Competing Bid Meeting with Skadden and Goldman to discuss whether to solicit competing bids, and again decided not to do so based on the same considerations discussed at the first Competing Bid Meeting in August. (A-44-45 at ¶87).

Later that day, Sumitovant and Sumitomo Pharma publicly announced their offer to acquire Myovant. (A-46 at ¶88). The announcement sought to discourage competing bids by insisting that Sumitovant and Sumitomo Pharma would not support an alternative transaction. (*Id.*). Subsequently, Myovant issued its own press release asserting that the bid "significantly undervalues" Myovant. (A-46 at ¶89).

On October 5, 2022—three days after the second Competing Bid Meeting— a large drug company (identified in the Proxy as "Company A") advised Goldman that it had seen the announcement and was evaluating a transaction with Myovant. (A-46-47 at ¶90). According to Goldman, Company A did not believe it would submit a proposal, given that Sumitovant and Sumitomo Pharma had insisted that

they would not support an alternative transaction. (A-47 at ¶91). That insistence, however, remained untested, and because the Special Committee was empowered to do so, it could have encouraged Company A to submit a competing bid. (A-46-47 at ¶90). In particular, the Special Committee could have executed a confidentiality agreement to facilitate due diligence by Company A. (A-46-47 at ¶90). But—while being advised by Skadden—the Special Committee did not take that step (A-781 last paragraph), thus squandering an opportunity to secure a competing bid and increase its negotiating leverage. (A-46-48 at ¶¶90-92). Not surprisingly, given the Special Committee's lack of encouragement, Company A advised Goldman on October 11, 2022, that it would not submit a competing bid. (A-48 at ¶93).

### 7. In the Absence of Competing Bids, Sumitovant and Sumitomo Pharma Successfully Pressure the Special Committee to Accept a Best and Final Offer of $27.00 Per Share

On August 22, 2022, the Special Committee approved revised projections for Myovant for 2022-2036 for use by Goldman in its analyses, but never provided those projections to Sumitovant's financial advisor, J.P. Morgan. (A-32-33 at ¶63; A-36 at ¶69; A-40-41 at ¶77). Therefore, Sumitovant created its own, more conservative, long-term projections ("Sumitovant Projections") forecasting lower sales of Myovant's two best-selling drugs during the years 2025-2036 than the projections used by Goldman. (A-41 at ¶¶78-79).

On September 27, 2022, J.P. Morgan presented a discounted cash flow

("DCF") analysis that—based on cash flows derived from the more conservative Sumitovant Projections—valued Myovant at $22.50 to $29.50 per share. (A-41-42 at ¶¶80-81). A separate "premium paid" analysis yielded a range of $20.00 to $28.00 per share. (A-42 at ¶81). Thus, even while using more conservative projections, Sumitovant and Sumitomo Pharma could have justified paying up to $29.50 per share for Myovant had they faced competing bids. (A-42 at ¶82).

On October 6, 2022, Goldman advised J.P. Morgan that any new bid should be near $30.00 per share. (A-48 at ¶92). Nevertheless, on October 20, 2022—even though J.P. Morgan's analyses supported a bid as high as $29.50 per share—the Sumitomo Pharma board authorized J.P. Morgan to offer only up to $27.00 per share. (A-49 at ¶96).

On October 21, 2022, J.P. Morgan increased the bid for Myovant to $25.25 per share, and then to $26.25 per share. (A-50 at ¶¶97-98). Goldman again informed J.P. Morgan that the Special Committee sought a price approaching $30.00 per share, and advised that Defendant Guinan would negotiate the final price with Myrtle Potter. (A-51 at ¶99) (Potter chaired the Myovant Board, but recused herself due to ties to Sumitovant, and served as Sumitovant's negotiator; A-25 at ¶43; A-740).

The next day, Potter offered $26.75 per share. (A-51 at ¶100). After Guinan rejected that price, Potter offered $27.00 per share as a best and final offer. (*Id.*). When Guinan countered with $28.50 per share, Potter reiterated that $27.00 per

share was the best and final offer, and advised that Sumitovant and Sumitomo Pharma would not proceed with a transaction at a higher price. (A-51 at ¶102).

Having declined to solicit competing bids, the Special Committee was left with no alternatives other than to accept or reject $27.00 per share. (A-53 at ¶104). That price, however, was at the lower end of the values generated by Goldman's two most credible analyses: (i) a range of $25.59 to $30.74 per share based on Goldman's DCF analysis, and (ii) a range of $25.34 to $36.39 per share based on an analysis of premiums paid in minority squeeze-out transactions in 2020 involving comparable biotech companies. (A-52-53 at ¶103). Goldman had prepared a third analysis that generated a range of $20.65 to $26.04 per share, but it was far less credible than Goldman's two other analyses since it relied on several older transactions involving companies outside the biotech industry going back as far as 2012. (*Id.*). Despite its earlier insistence that the price should approach $30.00 per share, and the fact that Goldman's two most credible analyses supported a higher price, the Special Committee capitulated and accepted $27.00 per share. (A-53-54 at ¶¶105-106).

On October 23, 2022—incentivized by a $38.9 million fee, plus a kicker of 0.5% of the price, contingent on the transaction closing (A-753-754)—Goldman opined that the price of $27.00 per share was fair to minority shareholders. (A-54 at ¶107). After receiving Goldman's opinion, the Special Committee recommended that the Board approve the Merger, which the Board did. (A-55 at ¶109-110).

Later that day, Myovant, Sumitovant, and Sumitomo Pharma announced the transaction. (A-12 at ¶3). Simultaneously, Sumitovant, Sumitomo Pharma and Sumitomo Chemical jointly filed a Schedule 13D with the SEC in which each declared a 51.7% interest in Myovant. (A-12 at ¶4; A-804 at 17:1-9).

### 8. Defendants File a Proxy Affirmatively Touting Skadden's "Independence" and "Absence of Conflicts"

On January 23, 2023, Defendants filed the Proxy (signed by Defendants Guinan, Marek and Lang). (A-13 at ¶6; A-738-740). As part of its pitch to secure votes, the Proxy affirmatively represented that Skadden had "an absence of conflicts" (A-743 last paragraph highlighted), and repeatedly touted Skadden's "independence." (highlights at A-741; A-746; A-748; A-751-752; A-823). For example, when listing the procedural safeguards purportedly supporting the transaction's fairness, the Proxy stated that the Special Committee was advised by "*independent* legal counsel." (A-747-748). Elsewhere, the Proxy stated that the Board approved the transaction after considering that the Special Committee (i) held 19 meetings with its "*independent* financial advisor and legal counsel," and (ii) was advised by a "nationally recognized *independent* legal counsel." (A-751-752).

The Proxy disclosed Goldman's potential conflicts (A-753 last full paragraph), but despite its repeated representations concerning Skadden's "independence" and "absence of conflicts," did not disclose the Sumitomo Group Engagements.

19

The Proxy further disclosed that Sumitomo Pharma had borrowed $1.7 billion from Sumitomo Banking to finance the purchase of Myovant. (A-414; A-624, No. (b)).

Finally, the Proxy advised minority shareholders in bold letters "WHERE YOU CAN FIND ADDITIONAL INFORMATION" (A-490), and cautioned them against relying on information from third parties. (*Id.*) (last paragraph). There was no reference to any documents disclosing the Sumitomo Group Engagements. (*Id.*).

On March 1, 2023, unaware of the Sumitomo Group Engagements, a majority of minority shareholders voted to approve the sale of Myovant, and on March 10, 2023, the sale closed. (A-58 at ¶¶119-120). Defendants Marek and Lang (who each signed the Proxy) both earned over $20 million (far exceeding their 2021 compensation). (A-56-57 at ¶¶113-114).

## B.    Relevant Procedural History and Rulings Below

On October 17, 2023, Plaintiff filed an amended complaint ("Complaint"), and on October 31, 2023, Defendants moved to dismiss. (A-7).

On December 12, 2023, the District Court held oral argument. (A-8). At the close of the hearing, Plaintiff's counsel requested leave to amend if necessary, but the District Court demanded that Plaintiff identify on the spot what allegations he would add—without the benefit of a ruling. (A-816 at 29:11-22). Plaintiff's counsel

responded, "at this point, I can't say," but opted to stand by the allegations if the Proxy was incorporated by reference. (A-816 at 29:23 to A-817 at 30:3).

On December 28, 2023, the District Court dismissed the Complaint with prejudice on several grounds. (SPA-1-19). *First*, citing a Second Circuit decision addressing grounds for disqualifying a law firm in pending litigation, the District Court held that the Sumitomo Group Engagements did not constitute potential conflicts that Defendants were obligated to disclose in the Proxy because Skadden's Sumitomo Group clients were not "operationally integrated" with Sumitovant, and only had small indirect ownership interests in Sumitovant. (SPA-8-10).

*Second*, the District Court held that the Complaint failed to plausibly allege that (i) the Sumitomo Group Engagements rendered Skadden less motivated to encourage the Special Committee to solicit competing bids, (ii) any conduct by Skadden discouraged the Special Committee from soliciting competing bids, and (iii) any conduct by Skadden undermined efforts to receive the highest possible sales price. (SPA-10-12).

*Third*, the District Court distinguished *Wilson* (SPA-13-15), finding that the facts here were "far removed" from those in *Wilson*. (SPA-14).

*Fourth*, the District Court held that even if the Sumitomo Group Engagements rendered Skadden conflicted, information about those engagements was publicly available, and thus part of the "total mix" of information already available to

21

minority shareholders. (SPA-15-16).

*Fifth*, the District Court held that the Complaint failed to adequately allege negligence. (SPA-16-18).

On December 29, 2023, the District Court entered final judgment dismissing the Complaint with prejudice. (SPA-20). On January 24, 2024, Plaintiff timely appealed. (A-826).

## SUMMARY OF ARGUMENT

**Points I.A-B.** To plead a Section 14(a) claim, a shareholder must allege a material misrepresentation or omission in a proxy. Materiality is a "fact-specific finding," and thus the burden to plead materiality is low—alleged misstatements and omissions should not be dismissed as immaterial unless they are "*so obviously unimportant* to a reasonable investor." *Litwin*, 634 F.3d at 717-18.

In *Wilson*, this Court held that where a proxy "necessarily implie[s]" that a sell-side law firm is acting with "complete loyalty," selling shareholders would deem it important to know about any relationships between the sell-side law firm and buy-side entities that "might be perceived" to impair the law firm's advocacy. 855 F.2d at 994.

Here, the Proxy affirmatively represented that Skadden had no conflicts and repeatedly described Skadden as "independent" (*i.e.*, not subject to any influences impairing its loyalty to Myovant's minority shareholders). As such, Skadden's

22

Sumitomo Group Engagements would not have been "so obviously unimportant" to reasonable minority shareholders. To the contrary, reasonable minority shareholders would have deemed it important to know about the Sumitomo Group Engagements because—given the deep ties between Sumitomo Group members—those engagements might be perceived to have impaired Skadden's advocacy (including rendering Skadden unwilling to advise the Special Committee to solicit competing bids because doing so could complicate negotiations and thus undermine Skadden's good will with Sumitomo Banking and other Sumitomo Group members). *See Dearborn*, 2024 WL 1244032, at *18-19 (representations of buy-side interests can impair sell-side law firm's advocacy due to desire to maintain good will).[3]

Further, reasonable minority shareholders might have perceived that the Sumitomo Group Engagements depressed the sales price because the failure of the Special Committee to solicit competing bids—while being advised by Skadden—sharply diminished the Special Committee's negotiating leverage. *See In re S. Peru Copper Corp. S'holder Derivative Litig.*, 52 A.3d 761, 798 (Del. Ch. 2011) (failure to explore alternatives to controlling shareholder's bid deprives special committee of "negotiating leverage to extract better terms."), *aff'd*, 51 A.3d 1213 (Del. 2012).

---

[3] Delaware law is persuasive authority on the materiality of potential conflicts because Delaware courts have adopted the federal definition of materiality. *See Morrison v. Berry*, 191 A.3d 268, 283 n.63 (Del. 2018).

For these reasons, the federal securities laws obligated Defendants to disclose Skadden's Sumitomo Group Engagements in the Proxy; their failure to do so violated Section 14(a) of the Exchange Act and SEC Rule 14a-9.

**Point I.C.** The District Court held that Defendants were not obligated to disclose Skadden's Sumitomo Group Engagements in the Proxy. The District Court erred for several reasons.

*First*, the District Court cited *GSI Commerce Sols., Inc. v. BabyCenter, L.L.C.*, 618 F.3d 204 (2d Cir. 2010)—a case addressing disqualification—as authority for determining when a proxy must disclose unrelated engagements between a sell-side law firm and buy-side entities. The District Court's reliance on *GSI* was inapt because Plaintiff did not contend that Skadden's Sumitomo Group Engagements disqualified Skadden from representing the Special Committee. Instead, Plaintiff alleged only that after seeking to secure votes by touting Skadden's "independence" and absence of conflicts, Defendants were obligated to disclose the Sumitomo Group Engagements in the Proxy so that minority shareholders could judge the significance of those engagements for themselves. *Wilson*, 855 F.2d at 994. Therefore, the relevant precedent is *Wilson*, not *GSI*.

*Second*, in concluding that the Sumitomo Group Engagements did not pose potential conflicts requiring disclosure in the Proxy, the District Court focused on *just two* of the attributes of the Sumitomo Group *keiretsu* alleged in the Complaint—

24

the smaller cross-shareholdings, and the quarterly newsletter—and improperly disregarded all of Plaintiff's other allegations concerning the deep conglomerate-like ties between Sumitomo Group members; namely, a shared financing source, other joint PR activities, collaboration on business ventures, and a common 400-year-old history. Given these ties, reasonable minority shareholders might have perceived that the Sumitomo Group Engagements impaired Skadden's advocacy.

*Third*, in concluding that any conduct by Skadden could not plausibly have discouraged the Special Committee from soliciting competing bids or depressed the sales price, the District Court again disregarded numerous allegations, including (i) Skadden's participation in the two Competing Bid Meetings; (ii) the Special Committee's decision not to solicit competing bids, or meaningfully engage with Company A, as a direct result of those meetings; (iii) the substantial loss of negotiating leverage resulting from the Special Committee's decision not to solicit competing bids; and (iv) J.P. Morgan's analysis supporting a bid as high as $29.50 per share (had Sumitovant and Sumitomo Pharma faced competing bids). Given these facts, reasonable minority shareholders might have perceived that the Sumitomo Group Engagements motivated advice from Skadden that depressed the sales price.

*Fourth*, the District Court misconstrued *Wilson*, which articulated a broad test for determining when a proxy must disclose unrelated engagements between a sell-

side law firm and buy-side entities. In particular, the District Court failed to appreciate that *Wilson* focused on what reasonable selling shareholders "might perceive" (855 F.2d at 994), and that such shareholders might perceive that other types of organizational structures like *keiretsu* pose potential conflicts that could impair a law firm's advocacy, despite smaller percentage cross-shareholdings.

**Point II.** The District Court held that even if the Sumitomo Group Engagements posed a conflict for Skadden, the failure to disclose those engagements in the Proxy was excused as immaterial because third-party press releases ("Transaction Releases") announcing those engagements were publicly available. That ruling was inconsistent with Second Circuit precedent holding that "the mere presence in the media of sporadic news reports" does *not* give shareholders sufficient notice that proxies may be misleading, and that "such reports should *not* be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials." *United Paperworkers Int'l Union v. Int'l Paper Co.*, 985 F.2d 1190, 1199 (2d Cir. 1993).

The District Court's ruling was also inconsistent with the Proxy, which advised minority shareholders where to find additional information, but never mentioned the Transaction Releases. (A-490). Quite the opposite, the Proxy cautioned minority shareholders *not* to rely on information from third parties. (*Id.*).

26

**Point III.** In *Wilson*, this Court held that, as "a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact" adequately alleges negligence. 855 F.2d at 995. Plaintiff met this standard, but the District Court rejected it as imposing strict liability. In doing so, the District Court mistakenly conflated strict liability with a presumption of negligence (which is only one element of a Section 14(a) claim).

Further, Plaintiff explained at oral argument how the language in the Proxy demonstrated negligence by walking through the differences between how the Proxy described the Special Committee's vetting of Cooley versus its vetting of Skadden. The District Court characterized those differences as "minute," but a side-by-side comparison of the relevant passages in the Proxy shows that the differences were substantial. *See* table in Point III below.

**Point IV**. Based on the arguments above, the Court should reverse. But if the Court disagrees and affirms based on pleading deficiencies, it should direct the District Court to grant Plaintiff leave to replead to cure such deficiencies given this Court's oft-stated strong preference for resolving disputes on the merits, and its frequent observation that a plaintiff is typically not in a position to determine what additional allegations will be necessary to survive a motion to dismiss without the benefit of a definitive ruling by the lower court or this Court.

## STANDARDS OF REVIEW

This Court reviews a "district court's grant of a motion to dismiss *de novo*." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 166 (2d Cir. 2021). "*De novo* review is review without deference." *Zervos v. Verizon N.Y., Inc.*, 252 F.3d 163, 168 (2d Cir. 2001). The Court looks "at the matter anew, as though it had come to the courts for the first time." *Id.*

Further, when reviewing a dismissal under Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in appellant's favor. *New England Carpenters Guaranteed Annuity & Pension Funds v. DeCarlo*, 80 F.4th 158, 168 (2d Cir. 2023). Inferences may not be drawn in appellees' favor. *Knopf v. Esposito*, 803 F. App'x 448, 453 (2d Cir. 2020).

Finally, when asserting a Section 14(a) claim, a plaintiff need not plead "state of mind" allegations under the PSLRA since such a claim need only plead negligence, and not scienter. *Enzo Biochem, Inc. v. Harbert Discovery Fund, LP*, 2021 WL 4443258, at *7-8 (S.D.N.Y. Sept. 27, 2021). Thus, a Section 14(a) claim is subject only to the "short and plain statement" requirements of Federal Rule 8(a). *Cf. Litwin*, 634 F.3d at 715 (since plaintiff need only allege negligence under Section 11, "this is an ordinary notice pleading case.").

Denial of leave to amend is reviewed for abuse of discretion. *APP Grp. (Canada) Inc. v. Rudsak USA Inc.*, 2024 WL 89120, at *1 (2d Cir. Jan. 9, 2024).

# ARGUMENT

I.  **Plaintiff Adequately Alleges Material Misstatements and Omissions Based on Defendants' Failure to Disclose Skadden's Sumitomo Group Engagements in the Proxy**

   A.  **Alleged Misstatements and Omissions Should Not be Dismissed as Immaterial Unless They Are "So Obviously Unimportant" to a Reasonable Investor**

To state a claim under Section 14(a), a plaintiff must adequately plead material misstatements or omissions in a proxy. *Enzo*, 2021 WL 4443258, at *9. Because materiality is "an inherently fact-specific finding," the burden to plead materiality is low (*Litwin*, 634 F.3d at 718), and materiality "will rarely be dispositive in a motion to dismiss." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 151 (2d Cir. 2021). Indeed, even at the summary judgment stage—let alone at the pleading stage—the "determination of materiality requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, *and these assessments are peculiarly ones for the trier of fact*." *Litwin*, 634 F.3d at 717 (quoting *TSC Indus. v. Northway*, 426 U.S. 438, 450 (1976)).

Based on these principles, alleged misstatements and omissions should not be dismissed as immaterial at the pleading stage unless they are "so obviously unimportant to a reasonable investor." *Litwin*, 634 F.3d at 717; *accord Altimeo*, 19 F.4th at 151. Under *Wilson*, where a proxy "necessarily implie[s]" that a sell-side law firm acted "with complete loyalty," reasonable selling shareholders would deem

29

it important to know about any "conflicting interests that might, or might be perceived" to have affected the law firm's advocacy, so that they can "judge for themselves what significance to attribute" to such potential conflicts when voting. 855 F.2d at 994.

### B. Because the Proxy Affirmatively Touted Skadden's "Independence" and "Absence of Conflicts," Reasonable Myovant Minority Shareholders Would Have Deemed it Important to Know About the Sumitomo Group Engagements When Voting

As part of its pitch to secure votes, the Proxy affirmatively touted Skadden's "absence of conflicts" and "independence," *i.e.*, ability to act in the best interests of minority shareholders free of extraneous influences. *See Goldstein v. Denner*, 2022 WL 1671006, at *40 (Del. Ch. May 26, 2022) (defining independence); *see also Enzo*, 2021 WL 4443258, at *10 (independent means "conflict-free" and able to "act in the best interests" of shareholders); *Millenco L.P. v. meVC Draper Fisher Jurvetson Fund I*, Inc., 824 A.2d 11, 18 (Del. Ch. 2002) ("frequent references" to "independent" directors strongly implied that directors "were free to act with complete and undivided loyalty").

Consequently, reasonable minority shareholders would have deemed it important to know about any relationships that "might be perceived" as having impaired Skadden's advocacy so that they could "judge for themselves what significance to attribute" to such relationships when voting. *Wilson*, 855 F.2d at 994; *see also Enzo*, 2021 WL 4443258, at *10 (where proxy described director as

30

"independent and conflict-free," reasonable shareholders would have considered disclosure of "pre-existing conflicts" important when voting); *Allen v. Harvey*, 2023 WL 7122641, at *5, 7 (Del. Ch. Oct. 30, 2023) (after touting independence of transaction committee's replacement advisors as a "procedural safeguard," and *promoting* disinterestedness of committee members, and "*declaring it as a reason for voter confidence,*" any undisclosed information weighing against disinterestedness of committee members and their advisors "was *extremely relevant* to a reasonable stockholder's decisionmaking.").

Courts recognize that concurrent and past representations of buy-side entities in unrelated matters can impair a sell-side law firm's advocacy during negotiations (in part because of the firm's incentive to maintain good will with those entities); accordingly, such representations are material facts that must be disclosed. *See Wilson*, 855 F.2d at 993-94 (proxy should have disclosed longstanding relationships between sell-side attorneys and buy-side entities that might be perceived to have affected the attorneys' advocacy); *Dearborn*, 2024 WL 1244032, at *18-19 (law firm's concurrent and past relationships with buy-side entities raised legitimate concern concerning vigor of firm's advocacy due to incentive to maintain good will with such entities; accordingly, such "conflicts were material and should have been disclosed"); *see also In re PLX Tech. Inc. S'holders Litig.*, 2018 WL 5018535, at *43 & n.513 (Del. Ch. Oct. 16, 2018) ("when dealing with an industry that values

31

relationships," court cannot ignore that sell-side financial advisor's "ongoing relationship" with buyer in unrelated matters provided a "powerful incentive 'to maintain good will and not push too hard' during the negotiations.").

Here, Sumitomo Group members are deeply interconnected. (Facts A.1). As such, reasonable minority shareholders might have perceived that Skadden's Sumitomo Group Engagements impaired Skadden's advocacy on their behalf. In particular, reasonable minority shareholders might have perceived that the Sumitomo Group Engagements rendered Skadden unwilling to advise the Special Committee to solicit competing bids since doing so could complicate negotiations, and thus undermine Skadden's good will and ongoing relationships with Sumitomo Group members (including Sumitomo Banking—Skadden's concurrent client and the Sumitomo Group's most prominent member—which, if a competing bidder emerged, would need to either increase the amount of its loan or lose the financing opportunity). (A-39 at ¶75; A-799 at 12:3 to A-800 at 13:16). As the Delaware Chancery Court—a court with special expertise evaluating conflicts in merger litigation—has put it, a "fist fight of a negotiation might leave a bloodied [adversary] unreceptive to a [future deal]." *PLX*, 2018 WL 5018535, at *43 n.513.

Moreover, minority shareholders might have perceived that the Sumitomo Group Engagements depressed the sales price because the failure of the Special Committee to solicit competing bids—while being advised by Skadden—sharply

diminished its negotiating leverage. *See Peru*, 52 A.3d at 798 (failure to explore alternatives to controller's bid deprives special committee of "negotiating leverage to extract better terms.").

For these reasons, Skadden's Sumitomo Group Engagements would not have been "so obviously unimportant" to reasonable minority shareholders. Thus, Defendants were obligated to disclose the Sumitomo Group Engagements in the Proxy by way of a disclosure like the one set forth at the end of the Introduction section above. They failed to do so, and thus violated Section 14(a) of the Exchange Act and SEC Rule 14a-9. *See Baum v. Harman Int'l Indus., Inc*., 575 F. Supp. 3d 289, 301-02 (D. Conn. 2021) (where buyer (Samsung Electronics) was a member of a Korean conglomerate, plaintiff adequately plead Section 14(a) claim under *Wilson* where proxy failed to disclose that an affiliate of seller's financial advisor was *concurrently* providing investment services to the subsidiary of another entity (Samsung Life) in the same conglomerate, even though Samsung Life was "a completely separate entity" from Samsung Electronics).

### C. The District Court Erred When It Concluded That Defendants Were Not Obligated to Disclose Skadden's Sumitomo Group Engagements in the Proxy

Despite lacking expertise concerning the significance of *keiretsu* relationships, the District Court held that Defendants were not obligated to disclose Skadden's Sumitomo Group Engagements in the Proxy. The District Court erred by

applying the wrong legal standards, improperly disregarding numerous allegations in the Complaint, and misconstruing *Wilson*.

> **1.  The District Court Inaptly Cited a Second Circuit Case Addressing Disqualification as Authority to Establish Disclosure Standards for Proxies**

Citing *GSI*, *supra*, the District Court held that Skadden's Sumitomo Group Engagements did not pose a potential conflict that should have been disclosed in the Proxy because Sumitovant was neither a wholly-owned subsidiary of Skadden's Sumitomo Group clients, nor "operationally integrated" with any of those entities. (SPA-8-9). The District Court's reliance on *GSI* to set the standard for disclosing a sell-side law firm's potential conflicts in a proxy was inapt.

*GSI* addressed whether a law firm (Blank Rome) should be disqualified from representing a party (GSI) in contract-related litigation against the wholly-owned subsidiary (BabyCenter) of another Blank Rome client (J&J). 618 F.3d at 206. Disclosure was not an issue; Blank Rome had promptly advised J&J that Blank Rome was representing GSI in a dispute against BabyCenter. *Id.* at 208.

Yet, citing *GSI*, the District Court ruled that whether a proxy must disclose a sell-side law firm's potential conflicts turns on whether such conflicts constitute grounds for disqualification. But the considerations governing whether to disqualify a firm from representing a particular client in a specific dispute substantially differ from the concerns guiding when a proxy must disclose relationships between a sell-

34

side law firm and buy-side entities. Because of those differences, the contexts requiring disclosure will necessarily be much broader than the contexts mandating disqualification.

In connection with disqualification, courts need to "be solicitous of a client's right freely to choose his counsel," which substantially raises the bar to disqualify a law firm. *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978). In the proxy disclosure context, that consideration is irrelevant; courts are instead concerned exclusively with the perspective of reasonable shareholders (*TSC*, 426 U.S. at 445), and to that end focus on formulating standards that will protect the ability of such shareholders to cast "informed" votes without burdening them with trivial information. *Id.* at 448-49. In *Wilson*, this Court struck that balance with respect to sell-side law firms by requiring disclosure of relationships that "might be perceived" by selling shareholders as impairing the advocacy of such firms. 855 F.2d at 994 (citing *Kas v. Fin. Gen. Bankshares, Inc.*, 796 F.2d 508, 513 (D.C. Cir. 1986) (disclosure violation stems from failure to put shareholders on notice of potential impairment of judgment of fiduciary purporting to represent their interests)).

Here, Plaintiff does not argue that the Sumitomo Group Engagements should have disqualified Skadden from representing the Special Committee. Nor does Plaintiff maintain that the Proxy should have criticized Skadden. (A-823). Instead, Plaintiff contends only that after seeking to secure votes by touting Skadden's

35

"independence" and "absence of conflicts," Defendants should have disclosed the Sumitomo Group Engagements so that Myovant's minority shareholders could have evaluated the significance of those engagements for themselves. *Wilson*, 855 F.2d at 994; *see also Dearborn*, 2024 WL 1244032, at *19 (appellants not contending that conflicts were "necessarily disabling," but only that "at the very least" such conflicts "should have been disclosed to stockholders."). Thus, the controlling precedent is *Wilson*, not *GSI*.

### 2. The District Court Improperly Disregarded Virtually All of Plaintiff's Allegations Concerning the Deep Ties Between Members of the Sumitomo Group *Keiretsu*

In concluding that Skadden's Sumitomo Group Engagements did not pose a conflict requiring disclosure, the District Court focused on *just two* of the attributes of the Sumitomo Group *keiretsu* alleged in the Complaint—the smaller cross-shareholdings, and the quarterly newsletter—and improperly disregarded all of Plaintiff's other allegations concerning the deep conglomerate-like ties between Sumitomo Group members. (SPA-9-10). *See Christine Asia Co. v. Ma*, 718 F. App'x 20, 23 (2d Cir. 2017) (district court improperly discredited allegations).

The Complaint alleges far more robust and extensive ties between Sumitomo Group members than just cross-shareholdings, and a quarterly newsletter; namely, a shared financing source, collaboration on business ventures, coordination of PR initiatives, and a common 400-year old history. (Facts A.1; A-803 at 16:5 to A-804

36

at 17:18; A-820). In particular, with respect to PR coordination, the paragraph in the Complaint quoted by the District Court (SPA-9) alleged that the Sumitomo PAC "engages in public relations activities to enhance public trust in the members of the Sumitomo Group, *including* publication of a quarterly newsletter." (A-25 at ¶40; *see also* A-13 at ¶5 ("including" appears in parenthetical)). The District Court overlooked the word "including," and wrongly assumed that the quarterly newsletter was the *only* joint PR activity undertaken by Sumitomo Group members. In doing so, it also overlooked the link in footnote 4 of the Complaint, which shows that the quarterly newsletter is just one of several joint PR activities of the Sumitomo PAC: https://www.sumitomo.gr.jp/english/committee/message/ (A-13 at ¶5 & n.4). *See Trump v. Vance*, 977 F.3d 198, 210 & n.8 (2d Cir. 2020) (considering full contents of article referenced in complaint, including citing URL of article and quoting passage from article not alleged in the complaint); *Mockingbird 38, LLC v. Int'l Bus. Times, Inc*., 2022 WL 154137, at *4 & n.4 (S.D.N.Y. Jan. 18, 2022) (considering contents of People Magazine article at link cited in the complaint); *Atl. Recording Corp. v. Project Playlist, Inc*., 603 F. Supp. 2d 690, 694 & n.3 (S.D.N.Y. 2009) (considering website on motion to dismiss).

Finally, the District Court paid no heed to the reason why the Complaint highlighted the quarterly newsletter; *i.e.*, because it is a significant initiative evidencing strong ties—Presidents and CEOs at Sumitomo Banking, Sumitomo

Chemical and other Sumitomo Group members use the newsletter to communicate with employees across the Sumitomo Group. (A-13 at ¶5; A-25 at ¶40).

In sum, when considered holistically, the deep ties between Sumitomo Group members alleged in the Complaint adequately plead that the Sumitomo Group *keiretsu* is a cohesive conglomerate-like network of entities that collaborate across multiple areas. (A-814 at 27:15-17). *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007) ("court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically."); *see also To-Am Equip. Co. v. Mitsubishi Caterpillar Forklift Am., Inc*., 152 F.3d 658, 660 (7th Cir. 1998) (*keiretsu* is traditional Japanese form of conglomerate).

Given those allegations, the District Court erred when it held that Skadden's Sumitomo Group Engagements did not pose a conflict requiring disclosure. The District Court had no expertise concerning the significance of *keiretsu* relationships, and thus should have left it for the trier of fact (aided by expert testimony) to determine how reasonable minority shareholders might have perceived the significance of the Sumitomo Group Engagements *vis a vis* Skadden's advocacy. *Wilson*, 855 F.2d at 994; *see also Litwin*, 634 F.3d at 717 (assessments of inferences reasonable shareholders would draw from a given set of facts and the significance of those inferences are "for the trier of fact.").

### 3. The District Court Improperly Disregarded Allegations Establishing the Plausibility of Skadden's Motivations and Their Impact on the Adequacy of the Sales Price

The District Court concluded that it was implausible that (i) the Sumitomo Group Engagements rendered Skadden less motivated to encourage the Special Committee to solicit competing bids, (ii) any conduct by Skadden discouraged the Special Committee from soliciting competing bids, and (iii) any conduct by Skadden depressed the sales price. (SPA-10-12). Thus, in the District Court's view, nondisclosure of the Sumitomo Group Engagements was immaterial.

Once again, the District Court improperly disregarded key allegations:

(i) the extensive collaboration and deep conglomerate-like ties between Sumitomo Group members;

(ii) Skadden's longstanding and ongoing relationships with Sumitomo Group members;

(iii) the suspect circumstances under which Skadden was retained;

(iv) Skadden's participation in the two Competing Bid Meetings;

(v) the Special Committee's decision not to solicit competing bids, or meaningfully engage with Company A, as a direct result of those meetings;

(vi) the substantial loss of negotiating leverage resulting from the Special Committee's decision not to solicit competing bids; and

(vii) J.P. Morgan's analysis supporting a bid as high as $29.50 per share (had Sumitovant and Sumitomo Pharma faced competing bids).

(Facts A.1, 3-7). *See Christine*, 718 F. App'x at 23 (district court improperly

discredited allegations).

Given those allegations, reasonable minority shareholders plausibly might have perceived the following (had they been aware of the Sumitomo Group Engagements): (i) the Sumitomo Group Engagements rendered Skadden less motivated to encourage competing bids, (ii) because of Skadden's advice at the Competing Bid Meetings, the Special Committee elected not to solicit competing bids, and (iii) the failure to solicit competing bids depressed the sales price. Thus, disclosure of the Sumitomo Group Engagements would have been important to minority shareholders when deciding how to vote.

(a) **Minority Shareholders Plausibly Might Have Perceived That the Sumitomo Group Engagements Rendered Skadden Less Motivated to Encourage Competing Bids**

The District Court concluded that it was implausible that the Sumitomo Group Engagements rendered Skadden less motivated to encourage competing bids. (SPA-10). That conclusion, however, depended on the District Court's disregard of virtually all of Plaintiff's allegations concerning the Sumitomo Group. (Point I.C.2). Given that Plaintiff adequately pleads that the Sumitomo Group *keiretsu* is a cohesive conglomerate-like network of entities that collaborate across multiple areas (Facts A.1), reasonable minority shareholders plausibly might have perceived that the Sumitomo Group Engagements impaired Skadden's advocacy, including rendering Skadden unwilling (at the Competing Bid Meetings) to encourage

competing bids in order to avoid undermining its good will with Sumitomo Banking and other Sumitomo Group members. (Point I.B). The District Court was wrong to conclude otherwise at the pleading stage. *See Litwin*, 634 F.3d at 717 (quoted *supra*).

### (b) Minority Shareholders Plausibly Might Have Perceived That Skadden's Advice at the Competing Bid Meetings Caused the Special Committee Not to Solicit Competing Bids

The District Court concluded that it was implausible to suggest that "any conduct by Skadden is why the special committee did not solicit bids from other potential acquirers." (SPA-11). But since reasonable minority shareholders plausibly might have perceived that the Sumitomo Group Engagements rendered Skadden unwilling to encourage solicitation of competing bids (Point I.B), it is also plausible that such shareholders might have perceived that Skadden's advice at those meetings is what caused the Special Committee not to solicit competing bids. *See Kahn v. Tremont Corp*., 694 A.2d 422, 429 (Del. 1997) (in complex transactions, "professional advisors have the ability to influence directors who are anxious to make the right decision but who are often *in terra cognito*.").

The District Court cited the reasons listed in the Proxy for not soliciting competing bids (A-36-37 at ¶70) as proof that Skadden was not "why" the Special Committee did not solicit competing bids. (SPA-11). But those reasons could have been supplied by Skadden while compromised by conflicting interests. Those reasons almost certainly did not originate with Goldman, which advises sell-side

41

negotiators that "[c]ompetition (real or perceived) is the *best way* to drive bidders to their point of indifference." *In re Columbia Pipeline Grp., Merger Litig.*, 299 A.3d 393, 423 (Del. Ch. 2023).

Moreover, the District Court failed to consider that those reasons might reasonably be perceived as pretextual. *First*, "the risk that Sumitovant and [Sumitomo Pharma] would be unwilling to support a sale of Myovant to a third party," and "the likelihood that few parties other than one of Myovant's current commercial partners would be interested in a transaction" (A-36-37 at ¶70) were untested assumptions since the Special Committee never solicited competing bids, and thus could not have known (i) what the level of interest would have been, and (ii) whether Sumitovant and Sumitomo Pharma would have abandoned their opposition if a competing bid exceeded what they were willing to pay. (A-37 at ¶71; A-38 at ¶73).

*Second*, the concern about "the potential negative impact on Myovant and its relationships with third parties if such outreach were to become known" (A-36-37 at ¶70) would have dissipated once it became public knowledge on October 2, 2022 that Myovant was for sale. (A-46 at ¶¶88-89).

*Third*, the expectations "that the Special Committee could determine to reach out to third parties at a later time," and any merger agreement would "allow the Special Committee to consider unsolicited inbound acquisition proposals" (A-36-37

at ¶70), were never realized. Quite the opposite—the Special Committee never reached out to competing bidders (A-38 at ¶73), and instead agreed to a $55 million termination fee that concededly *discouraged* competing bids after the merger agreement was signed. (*Id.*; A-55-56 at ¶112).

*Fourth*, none of the reasons above justified the Special Committee's failure to facilitate a competing bid from Company A. (Facts A.6).

Ultimately, whether minority shareholders would have perceived the justifications above as pretextual is a determination for the trier of fact. *See Litwin*, 634 F.3d at 717 (quoted *supra*).

The District Court further asserted that Skadden's duty "was to give legal advice." (SPA-10). But in the same paragraph it acknowledged that Skadden also advised the Special Committee regarding bidding: "[t]he Amended Complaint details how the special committee, *advised by Skadden along the way*, engaged in a series of negotiations that pushed up Sumitovant's bid." (*Id.*). At any rate, no reasonable minority shareholder would have assumed that Skadden's attorneys sat silently through the Competing Bid Meetings without sharing their views on the critical issue of soliciting competing bids. Instead, reasonable minority shareholders more plausibly would have perceived that, compromised by its relationships with Sumitomo Group members, Skadden advanced reasons not to solicit competing bids. (Point I.B)

43

**(c)     Minority Shareholders Plausibly Might Have Perceived That the Special Committee's Failure to Solicit Competing Bids (While Advised by Skadden) Depressed the Sales Price**

Based on the increased bids submitted by Sumitovant's negotiators (Facts A.7), the District Court concluded that the Special Committee secured "the highest price it could." (SPA-10-11). But the fact that Sumitovant's bid increased over time from $22.75 per share to $27.00 per share does not prove that the Special Committee could not have achieved an even higher sales price had it exercised its power to solicit competing bids. As the Delaware Chancery Court has recognized, exploring alternatives to a controlling shareholder's bid increases a special committee's negotiating leverage. *Peru*, 52 A.3d at 800; *see also In re Mindbody, Inc., S'holder Litig.*, 2023 WL 2518149, at *26 (Del. Ch. Mar. 15, 2023) (evidence showed that buyer "could and would [have] gone higher" than its "best and final" offer had it "been pressured to do so.").

Likewise, when a special committee fails to explore alternatives to a controlling shareholder's bid, it deprives itself "of negotiating leverage to extract better terms." *Peru*, 52 A.3d at 798; *see also In re Appraisal of Columbia Pipeline Grp., Inc.*, 2019 WL 3778370, at *9 (Del. Ch. Aug. 12, 2019) (intuitive that lack of competing bids undermines bargaining leverage).

Here, as the Complaint alleged—but the District Court ignored—J.P. Morgan's analysis justified a price as high as $29.50 per share. (Facts A.7). But

Sumitovant and Sumitomo Pharma never felt pressure to go higher than their so-called "best and final offer" of $27.00 per share because the Special Committee—while being advised by Skadden—declined to exercise its power to solicit competing bids, and was left with no alternatives. (Facts A.5-7). Even when Company A reached out to express interest in acquiring Myovant, the Special Committee—while being advised by Skadden—did nothing to facilitate a competing bid even though it had nothing to lose and much to gain by doing so. (Facts A.6).

The District Court never acknowledged Company A's overture. But reasonable minority shareholders plausibly might have perceived that Company A would have submitted a bid exceeding the sales price had the Special Committee facilitated the due diligence necessary for Company A to submit a competing bid. (Facts A.6). That is not speculation. J.P. Morgan's analyses showed that Myovant was worth as high as $29.50 per share using conservative projections (Facts A.7), while Goldman's two most credible analyses showed that Myovant was worth $30.00 per share or more, which is the range on which the Special Committee initially insisted before capitulating in the absence of alternatives. (Facts A.7).

In sum, while being advised by Skadden, the Special Committee declined to exercise its power to solicit competing bids or to engage with Company A, and instead limited itself to accepting or rejecting the so-called "best and final offer" of Myovant's controlling shareholders. Thus, at the pleading stage, it is plausible that

45

reasonable minority shareholders might have perceived that the Sumitomo Group Engagements depressed the sales price by motivating advice that caused the Special Committee to decline to solicit competing bids. Accordingly, disclosure of the Sumitomo Group Engagements would have been important to minority shareholders when deciding how to vote.

### 4. The District Court Misconstrued *Wilson*

The District Court erred when it characterized *Wilson*'s fact pattern as an "entanglement between officers and directors of the two companies involved in a merger." (SPA-13). Instead, as shown below, *Wilson* formulated a test for determining when a proxy must disclose unrelated engagements between a sell-side law firm and buy-side entities.

The *Wilson* case concerned a merger between GAI and Chenango. 855 F.3d at 989. The Koffmans were officers, directors, and significant shareholders of both GAI and Chenango. *Id*. Plaintiff was a Chenango minority shareholder who sued the Koffmans and other defendants after the merger closed on the ground that the proxy failed to disclose, *inter alia*, that "*Chenango's counsel, David Dyer, and his firm had performed legal services for the Koffmans and their companies.*" *Id.* at 991. As this Court elaborated:

> [Plaintiffs] object to the nondisclosure of a business relationship between the late David Dyer and the Koffmans. Dyer was a Chenango shareholder, a director and its Secretary and General Counsel. *The proxy statement did not disclose that he represented Richard, Burton*

46

> *and Milton Koffman personally and that he and his firm represented more than one dozen entities controlled by the Koffmans. Dyer's firm had represented Koffman-controlled companies since 1933.*

*Id.* at 993.

The lower court excused the omission because "Dyer had played no role in the merger negotiations and his firm's representation of the Koffman interests was occasional rather than ongoing, was limited in scope and was not related to the merger." *Id.* at 993-94. This Court rejected that reasoning, holding that the "relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made," and thus where a proxy "necessarily implies" that a sell-side law firm was "acting with complete loyalty" to selling shareholders, the proxy must disclose any relationships that "might be perceived" as having impaired the law firm's advocacy. *Id.* at 994.

The District Court concluded that the facts of this case are "far removed from the circumstances" in *Wilson* because Plaintiff does not allege that Skadden had a relationship with Sumitovant, and instead only alleges a relationship between Skadden and "other companies in the Sumitomo Group that shared a quarterly newsletter with Sumitovant, including companies that held an ownership interest of a few percent in Sumitomo Chemical, which in turn was a majority of Sumitovant's corporate grandparent." (SPA-14-15). This conclusion is flawed for several reasons.

*First*, as noted, the District Court erred by focusing exclusively on the

quarterly newsletter and small cross-shareholdings, while disregarding Plaintiff's other allegations concerning the deep conglomerate-like ties between Sumitomo Group members. (Point I.C.2). Given those deep ties, the facts here are akin to the web of Koffman-controlled entities in *Wilson*, notwithstanding the unique structure of *keiretsu*.

*Second*, the District Court read *Wilson* narrowly to require disclosure *only* when a sell-side law firm has represented or is concurrently representing the buyer, entities that own 100% of the buyer, and/or affiliated entities that share a common owner with the buyer (like the Koffmans). But materiality is "an inherently fact-specific finding" (*Litwin*, 634 F.3d at 716), and thus there is no basis to impose such mechanical limitations on *Wilson*'s reach. To the contrary, *Wilson* broadly focused on what reasonable selling shareholders "might perceive" (855 F.2d at 994), and selling shareholders could certainly perceive that other types of structures like *keiretsu* pose potential conflicts that could impair a law firm's loyalty, despite much smaller percentage cross-shareholdings. *See Zenith Radio Corp. v. United States*, 606 F. Supp. 695, 699 (Ct. Int'l Trade 1985) (*keiretsu* "produces coordinated action and the practical effects of relationship without the presence of equity connections."), *aff'd*, 783 F.2d 184 (Fed. Cir. 1986).

Construing *Wilson* broadly is consistent with the principle that a court "must consider both quantitative *and* qualitative factors in assessing an item's materiality."

48

*Litwin*, 634 F.3d at 717. Here, Plaintiff alleged deep conglomerate-like ties between Sumitomo Group members across multiple areas. (Facts A.1). Given those *qualitative* allegations, it cannot be concluded at the pleading stage that reasonable minority shareholders would have considered the Sumitomo Group Engagements "so obviously unimportant" simply because *quantitatively*, percentage cross-shareholdings to the degree present in *Wilson* were absent here.

*Third*, the District Court overlooked three factors that make the argument for disclosure here considerably stronger than it was in *Wilson*. Number one, in order to reassure Myovant's minority shareholders and secure their votes, the Proxy expressly touted Skadden's "independence" and "absence of conflicts" (Facts A.8); in *Wilson*, it was only "necessarily *implied*" that the law firm was "acting with complete loyalty" to selling shareholders, and "without conflicting interests." (855 F.2d at 994). Given the affirmative representations here, the interest of Myovant's minority shareholders in learning about any relationships that impaired Skadden's advocacy would have been correspondingly greater than it was for the minority shareholders in *Wilson*. *See Allen*, 2023 WL 7122641, at *5 (after *promoting* disinterestedness of committee members, "*and then declaring it as a reason for voter confidence*," any undisclosed information weighing against disinterestedness of committee members and their advisors "was *extremely relevant* to a reasonable stockholder's decisionmaking.").

Additionally, the Proxy reflects that Skadden participated in two meetings at which soliciting competing bids was discussed (Facts A.5-6), and thus at which the Sumitomo Group Engagements could have colored Skadden's advice. The Proxy also reflects that, while being advised by Skadden, the Special Committee declined to meaningfully engage with Company A. (Facts A.6). Although it was decided post-trial, *Wilson* does not mention any evidence as to how the potential conflicts might have depressed the sales price, and yet those conflicts were still deemed material.

Finally, Skadden's representation of Sumitomo Banking and other Sumitomo Group members was extensive and ongoing while Skadden was advising the Special Committee (Facts A.4); in *Wilson*, Dyer's "firm's representation of the Koffman interests was occasional rather than ongoing," and "limited in scope." (855 F.2d at 993-94).

In sum, under *Wilson*, Defendants were obligated to disclose the Sumitomo Group Engagements in the Proxy.

## II.  Public Availability of Information From Third Parties Concerning Skadden's Sumitomo Group Engagements Did Not Excuse Nondisclosure of Those Engagements in the Proxy

The District Court held that even if the Sumitomo Group Engagements rendered Skadden conflicted, the failure to disclose those engagements in the Proxy was excused as immaterial because the Transaction Releases announcing those engagements were publicly available, and thus the Sumitomo Group Engagements

were already part of the "total mix of information" available to minority shareholders. (SPA-15-16).

This ruling went against well-established Second Circuit precedent, which "does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information." *Litwin*, 634 F.3d at 718. To the contrary, "[t]here are serious limitations on a corporation's ability to charge its stockholders with knowledge of information omitted from a document such as a proxy statement or prospectus on the basis that the information is public knowledge and otherwise available to them." *Kronfeld v. Trans World Airlines, Inc*., 832 F.2d 726, 736 (2d Cir. 1987); *accord New Jersey Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013).

Consistent with these principles, this Court held in a Section 14(a) case that "the mere presence in the media of sporadic news reports" does *not* give shareholders sufficient notice that proxies may be misleading, and that "such reports should not be considered to be part of the total mix of information that would clarify or place in proper context the company's representations in its proxy materials." *Paperworkers*, 985 F.2d at 1199. Thus, in *Paperworkers*, articles that were "few in number, narrow in focus, and remote in time," and not published in the context of the proxy solicitation, were not considered part of the information made available to shareholders. *Id*. Likewise, a Form 10-K not incorporated by reference into the proxy

was not part of the total mix of information made available. *Id.* at 1199-1200; *see also Shaev v. Saper*, 320 F.3d 373, 381 (3d Cir. 2003) (holding in Section 14(a) case that "[m]aterial not included in the proxy statement is generally not charged to the knowledge of the stockholder."). Indeed, under *Paperworkers*, even information *in the proxy itself*, "need not be considered part of the total mix reasonably available," if the information is "buried in unrelated discussions." 985 F.2d at 1199.

The District Court's ruling that the Transaction Releases were part of the "total mix" of information made available to minority shareholders was also inconsistent with the Proxy, which advised minority shareholders in bold letters "WHERE YOU CAN FIND ADDITIONAL INFORMATION" (A-490), but did not mention the Transaction Releases or incorporate them by reference. The Proxy also warned shareholders that "[n]o persons have been authorized to give any information or to make any representations other than those contained in this proxy statement and, if given or made, *such information or representations must not be relied upon*." (*Id.* at last paragraph). Thus, even if a minority shareholder had located one or more of the Transaction Releases, the Proxy cautioned them not to rely on such information. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 522 (S.D.N.Y. 2013) (because registration statement instructed investors not to rely on information "published by third parties," a "reasonable investor will not be charged to regard press reports as a reliable source of information.").

That Plaintiff became aware of the information in the Transaction Releases, and "was able to allege it in the Amended Complaint" (SPA-15), is irrelevant. Plaintiff is proceeding on behalf of a class where the relevant perspective is that of reasonable investors. *TSC*, 426 U.S. at 445. As shown, this Court does not charge reasonable shareholders with knowledge of information in sporadic news reports. To hold otherwise, and obligate shareholders to run Google searches to confirm the accuracy of information in proxies, would "create a 'super' shareholder standard" with "almost limitless opportunities for deception of the 'reasonable' shareholder." *Goldstein*, 2022 WL 1671006, at *25. As the Supreme Court has admonished, "***[t]he point of a proxy . . . should be to inform, not to challenge the reader's critical wits***." *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991); *see also Shaev*, 320 F.3d at 381-82 ("[t]hat an investor could hypothetically *conduct research* to clarify ambiguities and discover omissions in the proxy statement does not relieve the Board of its obligations under Rule 14a–9.") (citing *Virginia Bankshares*).

The sole authority cited by the District Court for imposing draconian due diligence burdens on shareholders asserting Section 14(a) claims was *In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.*, 272 F. Supp. 2d 243 (S.D.N.Y. 2003). (SPA-15). The allegedly omitted conflicts in *Merrill*, however, were "well-recognized for decades" (*id.* at 249), and widely reported in the business media "for years" (*id.* at 250-51), as the complaint there acknowledged. *Id.* at 251. Here, in

53

contrast, the Transaction Releases were one-off third-party press releases. (A-700-727). There is nothing in the record showing that such releases were the subject of widespread media coverage in the months before or after the Proxy was filed. *See Carpenters*, 709 F.3d at 127 n.12 (distinguishing between "merely available" and "widely known").

At oral argument, the District Court suggested that it would be inconsistent to charge Defendants with negligence for failing to uncover the Sumitomo Group Engagements, but allow Plaintiff to assert a negligence claim based on omission of facts that were publicly available. (A-804 at 17:19-24). As Plaintiff responded, there is no inconsistency. (A-804 at 17:25 to A-805 at 18:21). On the one hand, to ensure that minority shareholders were able to cast informed votes, Defendants were obligated to confirm that Skadden had no potential conflicts and was truly independent before promoting those "facts" in the Proxy. *See TSC*, 426 U.S. at 448 ("broad remedial purpose" of Rule 14a-9 is "to ensure disclosures by corporate management in order to enable the shareholders to make an informed choice."). As shown, Defendants knew they had that duty because they thoroughly vetted Cooley for potential conflicts; yet, according to the Proxy, they failed to carefully vet Skadden. (Facts A.3).

On the other hand, as shown, this Court's precedent did not obligate Myovant's minority shareholders to run Google searches to confirm the Proxy's

54

representations regarding Skadden's independence and lack of conflicts. Instead, they were entitled to assume that the Proxy contained—or incorporated by reference (A-490)—all of the material facts necessary for them to cast informed votes. Since that was not the case, minority shareholders have a viable Section 14(a) claim.

## III.   Plaintiff Adequately Alleges That the Proxy's Failure to Disclose Skadden's Sumitomo Group Engagements Was Negligent

*Wilson* held that "[a]s a matter of law, the preparation of a proxy statement by corporate insiders containing materially false or misleading statements or omitting a material fact" adequately alleges negligence. 855 F.2d at 995. Lower courts have applied this standard (*see, e.g.*, *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 91 (D. Conn. 2019)), and recognize that it sets a "low bar" for alleging negligence. *Fresno Cnty. Employees' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 560 (S.D.N.Y. 2017); *see also Dekalb Cnty. Pension Fund v. Transocean Ltd.*, 817 F.3d 393, 408 n.90 (2d Cir. 2016) ("a proxy solicitation that contains a misleading misrepresentation or omission violates [Section 14(a)] *even if the issuer believed in perfect good faith that there was nothing misleading in the proxy materials*.") (citation omitted).

The District Court refused to follow the *Wilson* negligence standard on the ground that it imposes strict liability. (A-801 at 14:10-11). This reasoning wrongly conflated a presumption of negligence with strict liability. That is, "negligence" is only one element of a Section 14(a) claim, and thus applying the *Wilson* negligence

standard merely satisfies that element, but does not impose liability (since a plaintiff must still prove transaction and loss causation). *See Enzo*, 2021 WL 4443258, at *9 (listing elements of Section 14(a) claim). In contrast, strict liability imposes liability upon a finding of materiality. *Tseng v. De Vries*, 2023 WL 8073087, at *1 (2d Cir. Nov. 21, 2023) (under Section 11, plaintiffs "are not required to plead scienter, reliance, or loss causation. Issuers are thus subject to virtually absolute liability.").

Here, Plaintiff satisfied the *Wilson* negligence standard by adequately alleging material misstatements and omissions in the Proxy. (Point I). Further, at oral argument, Plaintiff explained how the language in the Proxy demonstrated negligence by walking through the differences in how the Proxy described the Special Committee's vetting of Cooley versus its vetting of Skadden. (A-801 at 14:12 to A-802 at 15:7) (referring to A-379-380). The District Court characterized the differences as "minute" (SPA-17), but a side-by-side comparison of the relevant passages in the table at the top of the next page shows that the differences were substantial:

| Due Diligence With Respect to Cooley (A-379-380) | Due Diligence With Respect to Skadden (A-380) |
|---|---|
| "[O]n April 28, 2022, *the Special Committee held a meeting . . . with . . . Cooley in attendance*. The Special Committee discussed the engagement of a financial advisor and counsel for the Special Committee. ***Following discussion*** (*including review of the proposed forms of engagement letters with such advisors and disclosures regarding any potential conflicts of interest such advisors may have with respect to a potential transaction involving Sumitovant*), the Special Committee determined such advisors were not disqualified from being engaged by the Special Committee by virtue of any potential conflicts of interest with respect to a potential transaction with Sumitovant and SMP and *approved the engagement of . . . Cooley*." | "On June 28, 2022, the Special Committee held a meeting . . . with Goldman Sachs and . . . Skadden in attendance. ***Prior to representatives of Goldman Sachs and Skadden joining the meeting***, *the Special Committee determined to retain Skadden to serve as counsel to the Special Committee, based on*, among other things, Skadden's qualifications, experience and reputation and *the absence of conflicts on the part of Skadden*." |

Based on the comparison above, the Proxy does not reflect that the Special Committee vetted Skadden for potential conflicts like it had vetted Cooley. On April 28, 2022, the Special Committee "determined" that Cooley did not have any potential conflicts only *after* meeting with Cooley, including a "review" of "the proposed forms of engagement letters," and "disclosures regarding any potential conflicts of interest." In contrast, on June 28, 2022—*before* Skadden joined the meeting—the Special Committee "*determined* to retain Skadden to serve as counsel" based on, among other things, "*the absence of conflicts on the part of Skadden*." *See*

*Dearborn*, 2024 WL 1244032, at *20 n.124 (directors need to learn about potential conflicts, and not merely check a box based upon conclusory representations that are not properly vetted).

### IV.  If the Court Affirms Based on Pleading Deficiencies, It Should Amend the Judgment to Provide for Dismissal Without Prejudice, and Direct the District Court to Grant Plaintiff Leave to Replead

At the close of oral argument, Plaintiff's counsel sought leave to amend if necessary, but the District Court demanded that he identify on the spot what allegations Plaintiff would add—without the benefit of a ruling. (A-816 at 29:11-22). Plaintiff's counsel responded, "at this point, I can't say," but opted to stand by the allegations if the Proxy was incorporated by reference. (A-816 at 29:23 to A-817 at 30:3). Based on this colloquy, the District Court dismissed the Complaint with prejudice. (SPA-20).

This Court has expressed a "strong preference for resolving disputes on the merits" in light of Federal Rule 15(a)(2), which directs that leave to amend should be freely granted. *Mandala v. NTT Data, Inc.*, 88 F.4th 353, 363 (2d Cir. 2023). As *Mandala* reiterated, a plaintiff's decision to "stand by the complaint" in the "critical absence of a definitive ruling" on a motion to dismiss should not work "a forfeiture of the protections afforded by Rule 15" since, without the benefit of a ruling, "many a plaintiff" will not "be in a position to weigh the practicality and possible means of curing specific deficiencies." *Id.* Indeed, "until this Court's decision on appeal," it

58

may not be clear "what other types of information might suffice at the pleading stage." *Id.* at 364.

As such, while Plaintiff maintains that he adequately pleads a Section 14(a) claim, and that the District Court simply disregarded many of his allegations (as argued above), if the Court disagrees and affirms based on pleading deficiencies, it should amend the judgment to provide for dismissal without prejudice, and direct the District Court to grant Plaintiff leave to replead to address such deficiencies. *See APP*, 2024 WL 89120, at *5 (affirming dismissal but vacating denial of leave to amend to allow plaintiff to cure deficiencies identified in Court's opinion); *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015) (directing lower court to grant plaintiff leave to amend based on "pleading defects" identified in Court's opinion).

## **CONCLUSION**

For the reasons above, Plaintiff respectfully asks the Court to reverse the dismissal of the Complaint. But if the Court affirms based on pleading deficiencies, it should amend the judgment to provide for dismissal without prejudice, and direct the District Court to grant Plaintiff leave to replead.

Dated: Monsey, New York
      May 7, 2024

Respectfully submitted,

By: */s/ Joshua E. Fruchter*

Joshua E. Fruchter
Wohl & Fruchter LLP
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Tel: (845) 290-6818
Fax: (718) 504-3773
Email: jfruchter@wohlfruchter.com

Joshua M. Rubin
Weiss Law
305 Broadway, 7th Floor
New York, NY 10007
Tel: (212) 682-3025
Fax: (212) 682-3010
Email: jrubin@weisslawllp.com

Michael A. Rogovin
Weiss Law
476 Hardendorf Ave. NE
Atlanta, Georgia 30307
Tel: (404) 692-7910
Fax: (212) 682-3010
Email: mrogovin@weisslawllp.com

*Attorneys for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of this Court's Local Rule 32.1(a)(4)(A) because this brief contains 13,373 words, excluding the parts of the brief exempted by Rule 32(f) of the Federal Rules of Appellate Procedure ("Federal Rules").

This brief complies with the typeface requirements of Federal Rule 32(a)(5) and the type-style requirements of Federal Rule 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman font.

May 7, 2024

*/s/ Joshua E. Fruchter*
Joshua E. Fruchter

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Jed S. Rakoff,
   U.S.D.J., dated December 28, 2023,
      Appealed From ...................................................... SPA-1

Judgment, filed December 29, 2023,
      Appealed From ...................................................... SPA-20

### RELEVANT AUTHORITIES

17 C.F.R. § 240.14a–9 ............................................. SPA-21

15 U.S.C.A. § 78n..................................................... SPA-23

SPA-1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOSEPH ZAPPIA, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> -v- <br><br> MYOVANT SCIENCES LTD., MYOVANT SCIENCES, INC., SUMITOMO PHARMA AMERICA, INC., TERRIE CURRAN, MARK GUINAN, DAVID MAREK, NANCY VALENTE, AND MATTHEW LANG, <br><br> Defendants. | 23-cv-8097 (JSR) <br><br> OPINION AND ORDER |

JED S. RAKOFF, U.S.D.J.:

      In this putative class action, Lead Plaintiff Joseph Zappia alleges that Myovant Sciences Ltd. ("Myovant") and other defendants filed with the SEC a materially false and misleading proxy statement in connection with Myovant's acquisition, in violation of Rule 14a-9 promulgated under Section 14(a) of the Securities Exchange Act. In particular, Zappia takes issue with the proxy statement's representation that Skadden, Arps, Slate, Meagher & Flom LLP ("Skadden"), the law firm hired to represent Myovant's special committee for the acquisition, had an "absence of conflicts" and was "independent." In reality, Zappia contends, Skadden had a conflict and lacked independence because of its

- 1 -

representation of companies that shared "informal business relations" with, and small indirect ownership interests in, Myovant's acquirer. The Court now grants defendants' motion to dismiss the Amended Complaint because it fails to plausibly allege a materially false or misleading statement or omission.

I.   Factual and Procedural Background

Defendant Myovant, a biopharmaceutical company that has developed drugs to treat hormone-sensitive conditions, was acquired by its majority shareholder Sumitovant Biopharma Ltd. ("Sumitovant") in an all-cash merger on March 10, 2023. ECF No. 19 ("Am. Compl."), at ¶¶ 2-4, 45, 119. Sumitovant is a wholly owned subsidiary of Japanese pharmaceutical company Sumitomo Pharma Co., Ltd. ("Sumitomo Pharma"), itself majority-owned (51.76%) by Sumitomo Chemical Co., Ltd. ("Sumitomo Chemical"). Id. ¶¶ 3-4. Sumitomo Pharma and Sumitomo Chemical are members of the "Sumitomo Group," a leading *keiretsu* in Japan. Id. ¶ 5. As the Amended Complaint alleges, "*[k]eiretsu* are networks of Japanese businesses connected by cross-shareholdings and informal business relations, which typically feature a member bank that lends funds to other companies in the *keiretsu*." Id. That member bank for the Sumitomo Group is Sumitomo Mitsui Banking Corporation ("Sumitomo Banking"), which provided the financing for Sumitovant's $1.7 billion acquisition of Myovant. Id. ¶ 8. Sumitomo Banking owns

- 2 -

approximately 1.4% of Sumitomo Chemical, the corporate grandparent of Sumitovant. Id.

On January 23, 2023, Myovant's board filed, with the authorization of the individual co-defendants,[1] a proxy statement with the SEC, soliciting Myovant's public shareholders to vote in favor of the acquisition by Sumitovant. Id. ¶¶ 6-7. The merger was expressly conditioned not only on approval by a majority of Myovant public shareholders -- which could be satisfied with Sumitovant's vote alone, because Sumitovant then owned approximately 52% of Myovant -- but also approval by a majority of Myovant's minority shareholders. Id. ¶¶ 4, 7. Those conditions were satisfied on March 1, 2023, when Sumitovant and a majority of Myovant's other public shareholders voted in favor of the merger for $27 per share. Id. ¶¶ 3, 9. That price had been negotiated by a special committee of Myovant's three independent directors, which retained Goldman Sachs as its financial advisor and Skadden as its legal advisor. Id. ¶¶ 9, 18. As a result of the special committee's negotiations, Sumitovant over time increased its initial offer of $22.75 per

---

[1] Co-defendants Terrie Curran, Mark Guinan, David Marek, Nancy Valente, and Matthew Lang were at all times here relevant members of Myovant's board of directors. Curran, Guinan, and Valente, the non-officer directors, comprised the special committee. See Am. Compl. ¶¶ 29-33.

share, to $25.25 per share, to $26.25 per share, to $26.75 per
share, and ultimately to its best and final offer of $27 per share,
which the special committee eventually accepted and shareholders
approved. Id. ¶¶ 84, 97-100.

On September 13, 2023, Joseph Zappia, who owned Myovant shares
at the time of the merger and voted in the merger's favor, filed
this putative class action against Myovant, Myovant's U.S.
subsidiary (Myovant Sciences, Inc.) that employed its executives,
Sumitomo Pharma America, Inc.,[2] and five of Myovant's officers
and/or directors, alleging that the proxy statement contained
materially false and misleading statements in violation of Section
14(a) of the Securities Exchange Act and accompanying Rule 14a-9.
Id. ¶¶ 140-48; see ECF No. 1. On consent, the Court appointed
Zappia as Lead Plaintiff on October 10, 2023, see ECF No. 18, and
Zappia filed an Amended Complaint on October 17, 2023, see ECF No.
19.

The Amended Complaint takes issue with Myovant's
representation in the proxy statement that the Skadden law firm
was chosen as a legal advisor to Myovant's special committee "based

---

[2] On July 1, 2023, Sumitovant and other U.S. subsidiaries of
Sumitomo Pharma were combined into Sumitomo Pharma America, Inc.
Id. ¶ 28.

- 4 -

on, among other things, . . . the absence of conflicts on the part of Skadden" and the related representation in the proxy statement that Skadden was "independent." Am. Compl. ¶¶ 9, 21 n.13. Zappia alleges that Skadden was in fact conflicted in its representation of the special committee because Skadden was concurrently representing and had previously represented Sumitomo Banking, which financed the merger, and other members of the Sumitomo Group, in other (unrelated) matters. Id. ¶¶ 10-14. Zappia further alleges that the individual co-defendants are liable as control persons under Section 20(a) of the Exchange Act. Id. ¶¶ 149-54. According to the Amended Complaint, "[d]efendants were at least negligent in filing the Proxy with these material misrepresentations and omissions." Id. ¶ 145.

On October 31, 2023, defendants moved to dismiss the Amended Complaint. See ECF No. 24 ("Mem."). After full briefing, see ECF Nos. 31 ("Opp."), 35 ("Reply"), the Court heard oral argument on December 12, 2023.

II.  Legal Background

Section 14(a) of the Exchange Act imposes liability on any person who violates a rule promulgated by the SEC about proxy statements "in respect of any security." 15 U.S.C. § 78n(a). One such promulgation is Rule 14a-9, which provides that no proxy statement may "contain[] any statement which, at the time and in

- 5 -

SPA-6

the light of the circumstances under which it is made, is false or misleading with respect to any material fact." 17 C.F.R. § 240.14a-9(a). "A fact is material for purposes of Rule 14a-9 if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." Koppel v. 4987 Corp., 167 F.3d 125, 131 (2d Cir. 1999).[3] "Once the proxy statement purports to disclose the factors considered by the board of directors, there is an obligation to portray them accurately." Id. "A private right of action under Rule 14a-9 is well established." Id.

"Under Rule 14a-9, plaintiffs need not demonstrate . . . knowing conduct . . . with an intent to deceive." Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 995 (2d Cir. 1987). "Liability can be imposed for negligently drafting a proxy statement." Id. However, even where, as here, a plaintiff alleges that defendants violated Rule 14a-9 negligently, rather than through fraud, the Private Securities Litigation Reform Act's provisions requiring specificity apply in assessing the sufficiency of the pleadings. See In re Bemis Co. Sec. Litig., 512 F. Supp. 3d 518, 528-29 (S.D.N.Y. 2021). In particular, the complaint must "specify each

---

[3] Here and elsewhere, internal alterations, citations, ellipses, and quotation marks have been omitted unless otherwise indicated.

statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u-4(b)(1).

III. Analysis

Whether assessed under the usual plausibility standard of Rule 12(b)(6) or the more stringent standard of the Private Securities Litigation Reform Act (PSLRA), the Amended Complaint fails to adequately allege a false or misleading statement or misleading omission. Additionally, the information supposedly omitted from the alleged misstatements was a matter of public knowledge. Finally, an independent basis for dismissal is that the Amended Complaint fails to adequately allege negligence.

The Amended Complaint does not support with well-pleaded facts its allegation that Skadden harbored a conflict of interest in representing the special committee. The Amended Complaint states that "[w]hen the Special Committee retained Skadden based on a purported 'absence of conflicts,' Skadden was concurrently representing Sumitomo Banking (which financed the Merger), as well as another member of the Sumitomo Group . . . and other affiliated entities, in connection with a strategic alliance with Jefferies Financial Group, Inc." Am. Compl. ¶ 10. Similarly, "Skadden was concurrently representing Sumitomo Banking in a strategic collaboration with Marathon Capital LLC." Id. ¶ 12. In addition, "Skadden was concurrently representing another member of the

- 7 -

Sumitomo Group, Sumitomo Mitsui Trust Bank, Limited ('Sumitomo Trust'), and Sumitomo Trust's parent . . . in connection with a strategic partnership with Apollo Global Management, Inc." Id. ¶ 13. Finally, "Skadden was concurrently representing Sumitomo Group member Sumitomo Nikko in connection with its role as international joint lead manager of the $459 million initial public offering . . . of Socionext Inc." Id. ¶ 14.[4]

The above allegations, even if taken as true for purposes of this motion, do not plausibly demonstrate a conflict of interest in Skadden's representation of the Myovant special committee. The Amended Complaint does not allege that Skadden has ever represented Sumitovant, the actual counterparty in the merger transaction, or its corporate parent, Sumitomo Pharma. And the Second Circuit has held that corporate "affiliates should not be considered a single entity for conflicts purposes based solely on the fact that one entity is a wholly-owned subsidiary of the other, at least when the subsidiary is not otherwise operationally integrated with the parent company." GSI Commerce Sols., Inc. v. Baby Center, LLC, 618 F.3d 204, 211 (2d Cir. 2010). Here, the Amended Complaint does not

---

[4] The Amended Complaint also points out that, more than a year before Skadden's representation of the special committee, the firm represented Sumitomo Banking and the U.S. subsidiary of Sumitomo Nikko in yet other unrelated matters. See Am. Compl. ¶ 15 n.12.

even allege that Sumitovant is a wholly-owned subsidiary of any of
the other Sumitomo Group entities that Skadden represented (or
vice versa). Rather, some of those entities owned minor holdings
-- just a few percent ownership -- in a different Sumitomo Group
entity, Sumitomo Chemical, that was a majority owner of
Sumitovant's corporate grandparent. For instance, as of September
30, 2022, Sumitomo Banking owned 1.41%, and Sumitomo Trust owned
1.77%, of Sumitomo Chemical. Am. Compl. ¶ 38. This, by itself, is
insufficient to establish a conflict.

Nor does the Amended Complaint allege that the other Sumitomo
Group entities that Skadden represented were "operationally
integrated" with Sumitovant in any meaningful way. GSI Commerce,
618 F.3d at 211. The most that the Amended Complaint musters is
the largely conclusory allegation that "[m]embers of the Sumitomo
Group act in concert through the Sumitomo Group Public Affairs
Committee, which engages in public relations activities to enhance
public trust in the members of the Sumitomo Group, including
publication of a quarterly newsletter." Am. Compl. ¶ 40. Zappia
fails to explain how sharing a quarterly newsletter for joint
promotion means that companies are operationally integrated. If
that were enough, any trade newsletter in which competitors jointly
promote their common industry would create operational
integration. The Amended Complaint's additional broad and vague

- 9 -

statement that members of a *keiretsu* are connected by "informal business relations" does not render the inference of operational integration any more plausible. Id. ¶ 39.

The Amended Complaint nevertheless alleges that because of Skadden's representation of other Sumitomo Group entities, Skadden (whose duty was to give legal advice) was somehow less motivated to encourage the special committee (which consisted of experienced businesspersons assisted by an outside financial advisor, Goldman Sachs) to seek the highest price per share that Sumitovant would pay or to solicit other potential acquirers. Id. ¶¶ 70-75. But the specific facts that the Amended Complaint elsewhere pleads belie this allegation, even taking the facts in the light most favorable to Zappia. The Amended Complaint details how the special committee, advised by Skadden along the way, engaged in a series of negotiations that pushed up Sumitovant's bid from an initial offer of $22.75 per share (that the special committee, advised by Skadden, publicly rejected out of hand), to $25.25 per share, to $26.25 per share, to $26.75 per share, and ultimately to Sumitovant's "best and final" offer of $27 per share. Id. ¶¶ 84-100. Moreover, even after a Sumitovant representative communicated "that $27.00 per share was the best and final price [it] was able to offer," the special committee, advised by Skadden, made a counteroffer of $28.50 per share. Id. ¶¶ 100-01. It was only after

the Sumitovant representative reiterated "that $27.00 per share was Sumitovant's and Sumitomo Pharma's best and final offer, and that the transaction would not move forward if the Special Committee required a higher price than $27.00 per share," id. ¶ 102, and after Myovant's financial advisor, Goldman Sachs (who the Amended Complaint makes no allegation was anything but impartial), "delivered its Fairness Opinion to the Special Committee concluding that the $27.00 per share in cash that would be paid to the holders of Myovant common shares (other than Sumitovant and its affiliates) pursuant to the Merger was fair from a financial point of view," id. ¶ 107, that the special committee recommended accepting Sumitovant's offer, id. ¶ 109. The Amended Complaint's own narrative of the special committee's negotiations thus throws cold water on the assertion that Skadden somehow thwarted efforts for Myovant to receive the highest price it could.

The Amended Complaint also pleads facts that make implausible the suggestion that any conduct by Skadden is why the special committee did not solicit bids from other potential acquirers. The Amended Complaint directly quotes the proxy statement's conclusion that the special committee considered "the risk that Sumitovant" -- which already held more than 50% of Myovant's public shares -- "would be unwilling to support a sale of Myovant to a third party[,] which could make any outreach futile, the likelihood that

- 11 -

few parties other than one of Myovant's current commercial partners would be interested in a transaction and the potential negative impact on Myovant and its relationships with third parties if such outreach were to become known, . . . and the expectation that any merger agreement that might ultimately be entered into with Sumitovant would be expected to allow the Special Committee to consider unsolicited inbound acquisition proposals that might be made." Id. ¶ 70. Although the Amended Complaint dismisses this explanation as speculative, it is in fact the Amended Complaint that is merely speculating about Skadden's motives and actions rather than making a plausible allegation based on information and belief. And to the extent the Amended Complaint alleges misconduct or breach of fiduciary duty by Myovant's board or the special committee, see, e.g., id. ¶¶ 71-72, a suit under Section 14(a) and Rule 14a-9 is not the appropriate vehicle to address such a breach. See Koppel, 167 F.3d at 133 ("[N]o general cause of action lies under § 14(a) to remedy a simple breach of fiduciary duty.").[5]

---

[5] In their motion to dismiss, defendants also discuss matters external to the Amended Complaint, such as earlier lawsuits that Zappia brought and dismissed, which alleged deficiencies with the proxy statement or potential breaches of duty. Defendants thus argue that this is an opportunistic, "lawyer-driven lawsuit." Mem. at 1-2. That rhetoric relies on materials not proper for the Court's consideration in assessing a motion to dismiss and on matters, such as speculation about a plaintiff's motivation for

- 12 -

Zappia relies on Wilson v. Great American Industries, Inc., 855 F.2d 987 (2d Cir. 1988), to argue that "[t]he relevant inquiry is not whether an actual conflict of interest existed, but rather whether full disclosure of potential conflicts of interest has been made." Id. at 994. In Wilson, the Second Circuit referred to providing shareholders an "opportunity to judge for themselves what significance to attribute to" a potential conflict of interest. Id. Read outside the context of the facts of that case, that broad statement might arguably lend some support to Zappia's view that the proxy statement's reference to Skadden's "absence of conflicts" was materially misleading. But Zappia "read[s] too much into too little." Nat'l Pork Producers Council v. Ross, 598 U.S. 356, 373 (2023). "The language of an opinion is not always to be parsed as though we were dealing with language of a statute." Id. "Instead, . . . opinions dispose of discrete cases and controversies and they must be read with a careful eye to context." Id.

The context of Wilson was an alleged entanglement between officers and directors of the two companies involved in a merger. Wilson, 855 F.2d at 989. In particular, David Dyer, a director of

_____

bringing suit, that are irrelevant to the question whether the Amended Complaint states a claim under Rule 14a-9.

the target company in that case, Chenango, as well as being Chenango's General Counsel, had also for years represented several of the significant directors, the Koffmans, of the acquiring company. Id. at 990. The plaintiffs alleged, and the Second Circuit held, that the proxy statement was materially misleading because it failed to disclose that representation even though it portrayed Dyer as loyal to Chenango. Id. at 991, 994. The Second Circuit explained that "[t]he description of Dyer's law firm in the proxy statement as 'having represented Chenango in connection with the Merger' necessarily implied that Dyer and his firm were acting with complete loyalty to Chenango and its shareholders and without conflicting interests that might, or might be perceived to, affect their judgment and advocacy on Chenango's behalf." Id. at 994. "Considering his status as the shareholders' counsel and as a director recommending the merger, Dyer's long-standing business relationship with the Koffmans should have been disclosed." Id.

The facts here are far removed from those circumstances. Zappia does not allege any potential conflict of interest stemming from a relationship between directors of Sumitovant and Myovant, the two companies that merged. Nor does the Amended Complaint allege that Skadden -- which served as counsel for the Myovant special committee but was not itself negotiating terms with Sumitovant or responsible for approving the deal -- had a

- 14 -

relationship with Sumitovant. Instead, the Amended Complaint refers to Skadden's professional relationship with other companies in the Sumitomo Group that shared a quarterly newsletter with Sumitovant, including companies that held an ownership interest of a few percent in Sumitomo Chemical, which in turn was a majority owner of Sumitovant's corporate grandparent. Given the markedly distinct facts in <u>Wilson</u>, there is no suggestion that the Second Circuit contemplated Skadden's much more attenuated relationship to be the kind of "potential conflict[] of interest" that must be disclosed to shareholders. <u>Id.</u>

Independent of all this, even if the Court were to accept as true the assertion that Skadden in some sense had a conflict of interest, a reasonable investor would not have found the proxy statement to be materially misleading in light of other public information. The Amended Complaint nowhere alleges that Skadden's representation of other Sumitomo Group entities was kept secret or was unknown to the public at the time of the proxy statement. Indeed, Zappia was himself aware of that information -- and was able to allege it in the Amended Complaint -- precisely because it <u>was</u> reasonably available to the public. <u>See In re Merrill Lynch & Co., Inc. Rsch. Reps. Sec. Litig.</u>, 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) ("Plaintiff's own Complaint demonstrates that information concerning companies in which the Fund might invest

. . . was publicly available. . . . Plaintiff therefore cannot show that such information was concealed from the markets or from Fund investors."). Omitted information in a proxy statement is only material to a reasonable investor if it "significantly alter[s] the total mix of information made available." Koppel, 167 F.3d at 131. Because "the total mix of information" included the very representations by Skadden that the Amended Complaint discusses, the statement that Skadden had an "absence of conflicts" could not have significantly altered a reasonable investor's impression. Id.; Am. Compl. ¶ 9.

Finally, the Amended Complaint fails to pass muster for another independent reason: It fails to adequately allege plausible facts supporting the claim of negligence. Although a claim under Rule 14a-9 does not require scienter, the parties agree it is not a strict liability provision either. See Wilson, 855 F.2d at 995. Yet the Amended Complaint's sole allegation pertaining to negligence is the conclusory statement that "[d]efendants were at least negligent in filing the Proxy with these material misrepresentations and omissions." Am. Compl. ¶ 145. That threadbare recital of an essential element of a Rule 14a-9 claim does not suffice. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

At oral argument, Zappia's counsel articulated a roundabout way the Court could infer defendants' negligence. The proxy

statement at issue (which all agree is incorporated by reference into the Amended Complaint) explains that in an April 2022 meeting, the special committee determined that the Cooley law firm -- which had represented the special committee prior to Skadden -- was not "disqualified from being engaged . . . by virtue of any potential conflicts of interest." ECF No. 25-3 ("Proxy"), at 25-26. By contrast, the proxy statement does not expressly state that the special committee ever inquired into whether Skadden had a conflict of interest in the representation. Instead, it stated that in a June 2022 meeting, "the Special Committee determined to retain Skadden to serve as counsel . . . based on, among other things, Skadden's qualifications, experience and reputation and the absence of conflicts on the part of Skadden." Id. at 26 (emphasis added). Zappia asks the Court to infer, from the minute differences between the description of Cooley and the description of Skadden, that the special committee failed to make any efforts to vet Skadden's independence. See 12/12/2023 Transcript of Mot. to Dismiss Arg. ("Transcript").

Zappia's suggested inference is implausible. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (emphasis added). While "[t]he

- 17 -

plausibility standard is not akin to a probability requirement, . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." Id. "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." Id. "Determining whether a complaint states a plausible claim for relief" is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 679. Applying "judicial experience and common sense" to Zappia's attenuated chain of reasoning regarding the special committee's alleged conduct, the Amended Complaint fails to show anything more than a remote, theoretical possibility that the special committee acted negligently rather than accidentally or reasonably. Id. Because theoretical possibility is far from plausibility, the Court finds that the Amended Complaint fails to adequately allege negligence.

    IV.  Conclusion

    Because the Amended Complaint fails to plausibly allege a violation of Rule 14a-9, the Court grants defendants' motion to dismiss. At oral argument, plaintiffs' counsel, confronted with all the arguments considered here, could not identify a single additional fact that any Second Amended Complaint would allege beyond what has already been pleaded. See Transcript. Accordingly,

the dismissal is with prejudice. The Clerk is respectfully directed
to close documents 23 and 27 on the docket, enter final judgment,
and close this case.[6]

    SO ORDERED.

New York, NY
December 2̲8̲, 2023

                                                   JED S. RAKOFF, U.S.D.J.

---

[6] While briefing on the motion to dismiss was underway, Zappia and
another potential plaintiff, Baruch Halberstam, moved to appoint
Halberstam as Co-Lead Plaintiff. See ECF No. 27. The Court's
dismissal of the Amended Complaint and entry of final judgment
render that motion moot.

SPA-20

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------------X

JOSEPH ZAPPIA, Individually and on behalf of all
Others similarly situated,

Plaintiff,

-against-

23 **CIVIL** 8097 (JSR)

<u>**JUDGMENT**</u>

MYOVANT SCIENCES LTD., MYOVANT
SCIENCES, INC., SUMITOMO PHARMA AMERICA,
INC., TERRIE CURRAN, MARK GUINAN, DAVID
MAREK, NANCY VALENTE, AND MATTHEW
LANG,

Defendants.

-----------------------------------------------------------------------X

It is hereby **ORDERED, ADJUDGED AND DECREED:** That for the reasons

stated in the Court's Opinion and Order dated December 28, 2023, because the Amended

Complaint fails to plausibly allege a violation of Rule 14a-9, the Court has granted defendants'

motion to dismiss. At oral argument, plaintiffs' counsel, confronted with all the arguments

considered here, could not identify a single additional fact that any Second Amended Complaint

would allege beyond what has already been pleaded. The dismissal is with prejudice.  Final

judgment is hereby entered; accordingly, the case is closed.

**Dated:**  New York, New York

December 29, 2023

**RUBY J. KRAJICK**

_____

**Clerk of Court**

**BY:**      K. Mango

_____

**Deputy Clerk**

SPA-21

Code of Federal Regulations
   Title 17. Commodity and Securities Exchanges
      Chapter II. Securities and Exchange Commission
         Part 240. General Rules and Regulations, Securities Exchange Act of 1934 (Refs & Annos)
            Subpart A. Rules and Regulations Under the Securities Exchange Act of 1934
               Regulation 14a: Solicitation of Proxies (Refs & Annos)

17 C.F.R. § 240.14a–9

§ 240.14a–9 False or misleading statements.

Effective: September 19, 2022
Currentness

(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

(b) The fact that a proxy statement, form of proxy or other soliciting material has been filed with or examined by the Commission shall not be deemed a finding by the Commission that such material is accurate or complete or not false or misleading, or that the Commission has passed upon the merits of or approved any statement contained therein or any matter to be acted upon by security holders. No representation contrary to the foregoing shall be made.

(c) No nominee, nominating shareholder or nominating shareholder group, or any member thereof, shall cause to be included in a registrant's proxy materials, either pursuant to the Federal proxy rules, an applicable state or foreign law provision, or a registrant's governing documents as they relate to including shareholder nominees for director in a registrant's proxy materials, include in a notice on Schedule 14N (§ 240.14n–101), or include in any other related communication, any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to a solicitation for the same meeting or subject matter which has become false or misleading.

Note: The following are some examples of what, depending upon particular facts and circumstances, may be misleading within the meaning of this section.

a. Predictions as to specific future market values.

b. Material which directly or indirectly impugns character, integrity or personal reputation, or directly or indirectly makes charges concerning improper, illegal or immoral conduct or associations, without factual foundation.

c. Failure to so identify a proxy statement, form of proxy and other soliciting material as to clearly distinguish it from the soliciting material of any other person or persons soliciting for the same meeting or subject matter.

§ 240.14a–9 False or misleading statements., 17 C.F.R. § 240.14a–9

---

d. Claims made prior to a meeting regarding the results of a solicitation.

**Credits**

[31 FR 212, Jan. 7, 1966, as amended at 41 FR 19933, May 14, 1976; 44 FR 38815, July 2, 1979; 44 FR 68456, Nov. 29, 1979; 75 FR 56782, Sept. 16, 2010; 75 FR 64641, Oct. 20, 2010; 76 FR 58100, Sept. 20, 2011; 85 FR 55155, Sept. 3, 2020; 87 FR 43196, July 19, 2022]

SOURCE: 50 FR 27946, July 9, 1985; 50 FR 28394, July 12, 1985; 50 FR 37654, Sept. 17, 1985; 50 FR 41870, Oct. 16, 1985; 50 FR 42678, Oct. 22, 1985; 51 FR 8801, March 14, 1986; 51 FR 12127, April 9, 1986; 51 FR 14982, April 22, 1986; 51 FR 18580, May 21, 1986; 51 FR 25882, July 17, 1986; 51 FR 36551, Oct. 14, 1986; 51 FR 44275, Dec. 9, 1986; 52 FR 3000, Jan. 30, 1987; 52 FR 8877, March 20, 1987; 52 FR 9154, March 23, 1987; 52 FR 16838, May 6, 1987; 52 FR 27969, July 24, 1987; 52 FR 42279, Nov. 4, 1987; 53 FR 26394, July 12, 1988; 53 FR 33459, Aug. 31, 1988; 53 FR 37289, Sept. 26, 1988; 54 FR 23976, June 5, 1989; 54 FR 28813, July 10, 1989; 54 FR 30031, July 18, 1989; 54 FR 35481, Aug. 28, 1989; 54 FR 37789, Sept. 13, 1989; 55 FR 23929, June 13, 1990; 55 FR 50320, Dec. 6, 1990; 56 FR 7265, Feb. 21, 1991; 56 FR 9129, March 5, 1991; 56 FR 12118, March 22, 1991; 56 FR 19156, April 25, 1991; 56 FR 28322, June 20, 1991; 56 FR 30067, July 1, 1991; 57 FR 18218, April 29, 1992; 57 FR 32168, July 21, 1992; 57 FR 36501, Aug. 13, 1992; 57 FR 47409, Oct. 16, 1992; 58 FR 14682, March 18, 1993; 59 FR 10985, March 9, 1994; 59 FR 55012, Nov. 2, 1994; 59 FR 66709, Dec. 28, 1994; 61 FR 48328, Sept. 12, 1996; 62 FR 543, Jan. 3, 1997; 62 FR 6071, Feb. 10, 1997; 62 FR 12749, March 18, 1997; 62 FR 35340, July 1, 1997; 63 FR 8102, Feb. 18, 1998; 63 FR 13944, March 23, 1998; 65 FR 76087, Dec. 5, 2000; 66 FR 21659, May 1, 2001; 66 FR 43741, Aug. 20, 2001; 66 FR 55837, 55838, Nov. 2, 2001; 67 FR 247, Jan. 2, 2002; 67 FR 57288, Sept. 9, 2002; 67 FR 58299, Sept. 13, 2002; 68 FR 4355, Jan. 28, 2003; 68 FR 5364, Feb. 3, 2003; 68 FR 18818, April 16, 2003; 68 FR 36665, June 18, 2003; 68 FR 64970, Nov. 17, 2003; 68 FR 67009, Nov. 28, 2003; 68 FR 69221, Dec. 11, 2003; 71 FR 65407, Nov. 8, 2006; 71 FR 74708, Dec. 12, 2006; 71 FR 76596, Dec. 21, 2006; 72 FR 4166, Jan. 29, 2007; 74 FR 68365, Dec. 23, 2009; 75 FR 2794, Jan. 19, 2010; 75 FR 9081, Feb. 26, 2010; 75 FR 54477, Sept. 8, 2010; 75 FR 64653, Oct. 20, 2010; 76 FR 4511, Jan. 26, 2011; 76 FR 6045, Feb. 2, 2011; 76 FR 34363, June 13, 2011; 76 FR 34590, June 14, 2011; 76 FR 41685, July 15, 2011; 76 FR 46620, Aug. 3, 2011; 76 FR 71876, Nov. 21, 2011; 77 FR 30751, May 23, 2012; 77 FR 38454, June 27, 2012; 77 FR 41647, July 13, 2012; 77 FR 48356, Aug. 13, 2012; 77 FR 56362, Sept. 12, 2012; 77 FR 56417, Sept. 12, 2012; 77 FR 66285, Nov. 2, 2012; 77 FR 73305, Dec. 10, 2012; 78 FR 4783, Jan. 23, 2013; 78 FR 42450, July 16, 2013; 78 FR 67633, Nov. 12, 2013; 79 FR 1548, Jan. 8, 2014; 79 FR 39159, July 9, 2014; 79 FR 47369, Aug. 12, 2014; 79 FR 55261, Sept. 15, 2014; 79 FR 57344, Sept. 24, 2014; 80 FR 14550, March 19, 2015; 80 FR 49013, Aug. 14, 2015; 81 FR 8637, Feb. 19, 2016; 81 FR 28705, May 10, 2016; 81 FR 30142, May 13, 2016; 81 FR 70900, Oct. 13, 2016; 82 FR 17555, April 12, 2017; 84 FR 33491, July 12, 2019; 84 FR 33629, July 12, 2019; 84 FR 44041, Aug. 22, 2019; 84 FR 55055, Oct. 15, 2019; 87 FR 73138, Nov. 28, 2022; 88 FR 42584, June 30, 2023; 88 FR 75185, Nov. 1, 2023; 89 FR 2825, Jan. 16, 2024, unless otherwise noted.

AUTHORITY: 15 U.S.C. 77c, 77d, 77g, 77j, 77s, 77z–2, 77z–3, 77eee, 77ggg, 77nnn, 77sss, 77ttt, 78c, 78c–3, 78c–5, 78d, 78e, 78f, 78g, 78i, 78j, 78j–1, 78j–4, 78k, 78k–1, 78l, 78m, 78n, 78n–1, 78o, 78o–4, 78o–10, 78p, 78q, 78q–1, 78s, 78u–5, 78w, 78x, 78dd, 78ll, 78mm, 80a–20, 80a–23, 80a–29, 80a–37, 80b–3, 80b–4, 80b–11, 7201 et seq., and 8302; 7 U.S.C. 2(c)(2)(E); 12 U.S.C.5221(e)(3); 18 U.S.C. 1350; and Pub.L. 111–203, 939A, 124 Stat.1376 (2010); and Pub.L. 112–106, sec. 503 and 602, 126 Stat. 326 (2012), unless otherwise noted.; Section 240.3a4–1 also issued under secs. 3 and 15, 89 Stat. 97, as amended, 89 Stat. 121 as amended;; Section 240.3a12–8 also issued under 15 U.S.C. 78a et seq., particularly secs. 3(a)(12), 15 U.S.C. 78c(a)(12), and 23(a), 15 U.S.C. 78w(a);; Section 240.3a12–10 also issued under 15 U.S.C. 78b and c;; Section 240.3a12–9 also issued under secs. 3(a)(12), 7(c), 11(d)(1), 15 U.S.C. 78c(a)(12), 78g(c), 78k(d)(1);; Sections 240.3a43–1 and 240.3a44–1 also issued under sec. 3; 15 U.S.C. 78c;; Sections 3a67–1 through 3a67–9 and 3a71–1 and 3a71–2 are also issued under Pub.L. 111–203, §§ 712, 761(b), 124 Stat. 1841 (2010).; Section 240.3a67–10, 240.3a71–3, 240.3a71–4, 240.3a71–5, and 240.3a71–6 are also issued under Pub.L. 111–203, secs. 712, 761(b), 124 Stat. 1754 (2010), and 15 U.S.C. 78dd(c).; Sections 240.3a71–3 and 240.3a71–5 are also issued under Pub.L. 111–203, sec. 761(b), 124 Stat. 1754 (2010), and 15 U.S.C. 78dd(c).; Section 240.3b–6 is also issued under 15 U.S.C. 77f, 77g, 77h, 77j, 77s(a).; Section 240.3b–9 also issued under secs. 2, 3 and 15, 89

SPA-23

United States Code Annotated
   Title 15. Commerce and Trade
      Chapter 2B. Securities Exchanges (Refs & Annos)

15 U.S.C.A. § 78n

§ 78n. Proxies

Effective: December 23, 2022
Currentness

**(a) Solicitation of proxies in violation of rules and regulations**

**(1)** It shall be unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title.

**(2)** The rules and regulations prescribed by the Commission under paragraph (1) may include--

   **(A)** a requirement that a solicitation of proxy, consent, or authorization by (or on behalf of) an issuer include a nominee submitted by a shareholder to serve on the board of directors of the issuer; and

   **(B)** a requirement that an issuer follow a certain procedure in relation to a solicitation described in subparagraph (A).

**(b) Giving or refraining from giving proxy in respect of any security carried for account of customer**

**(1)** It shall be unlawful for any member of a national securities exchange, or any broker or dealer registered under this chapter, or any bank, association, or other entity that exercises fiduciary powers, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to give, or to refrain from giving a proxy, consent, authorization, or information statement in respect of any security registered pursuant to section 78l of this title, or any security issued by an investment company registered under the Investment Company Act of 1940, and carried for the account of a customer.

**(2)** With respect to banks, the rules and regulations prescribed by the Commission under paragraph (1) shall not require the disclosure of the names of beneficial owners of securities in an account held by the bank on December 28, 1985, unless the beneficial owner consents to the disclosure. The provisions of this paragraph shall not apply in the case of a bank which the Commission finds has not made a good faith effort to obtain such consent from such beneficial owners.

**(c) Information to holders of record prior to annual or other meeting**

SPA-24

§ 78n. Proxies, 15 USCA § 78n

Unless proxies, consents, or authorizations in respect of a security registered pursuant to section 78*l* of this title, or a security issued by an investment company registered under the Investment Company Act of 1940, are solicited by or on behalf of the management of the issuer from the holders of record of such security in accordance with the rules and regulations prescribed under subsection (a) of this section, prior to any annual or other meeting of the holders of such security, such issuer shall, in accordance with rules and regulations prescribed by the Commission, file with the Commission and transmit to all holders of record of such security information substantially equivalent to the information which would be required to be transmitted if a solicitation were made, but no information shall be required to be filed or transmitted pursuant to this subsection before July 1, 1964.

**(d) Tender offer by owner of more than five per centum of class of securities; exceptions**

**(1)** It shall be unlawful for any person, directly or indirectly, by use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, to make a tender offer for, or a request or invitation for tenders of, any class of any equity security which is registered pursuant to section 78*l* of this title, or any equity security of an insurance company which would have been required to be so registered except for the exemption contained in section 78*l*(g)(2)(G) of this title, or any equity security issued by a closed-end investment company registered under the Investment Company Act of 1940, if, after consummation thereof, such person would, directly or indirectly, be the beneficial owner of more than 5 per centum of such class, unless at the time copies of the offer or request or invitation are first published or sent or given to security holders such person has filed with the Commission a statement containing such of the information specified in section 78m(d) of this title, and such additional information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors. All requests or invitations for tenders or advertisements making a tender offer or requesting or inviting tenders of such a security shall be filed as a part of such statement and shall contain such of the information contained in such statement as the Commission may by rules and regulations prescribe. Copies of any additional material soliciting or requesting such tender offers subsequent to the initial solicitation or request shall contain such information as the Commission may by rules and regulations prescribe as necessary or appropriate in the public interest or for the protection of investors, and shall be filed with the Commission not later than the time copies of such material are first published or sent or given to security holders. Copies of all statements, in the form in which such material is furnished to security holders and the Commission, shall be sent to the issuer not later than the date such material is first published or sent or given to any security holders.

**(2)** When two or more persons act as a partnership, limited partnership, syndicate, or other group for the purpose of acquiring, holding, or disposing of securities of an issuer, such syndicate or group shall be deemed a "person" for purposes of this subsection.

**(3)** In determining, for purposes of this subsection, any percentage of a class of any security, such class shall be deemed to consist of the amount of the outstanding securities of such class, exclusive of any securities of such class held by or for the account of the issuer or a subsidiary of the issuer.

**(4)** Any solicitation or recommendation to the holders of such a security to accept or reject a tender offer or request or invitation for tenders shall be made in accordance with such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

**(5)** Securities deposited pursuant to a tender offer or request or invitation for tenders may be withdrawn by or on behalf of the depositor at any time until the expiration of seven days after the time definitive copies of the offer or request or invitation

SPA-25

are first published or sent or given to security holders, and at any time after sixty days from the date of the original tender offer or request or invitation, except as the Commission may otherwise prescribe by rules, regulations, or order as necessary or appropriate in the public interest or for the protection of investors.

**(6)** Where any person makes a tender offer, or request or invitation for tenders, for less than all the outstanding equity securities of a class, and where a greater number of securities is deposited pursuant thereto within ten days after copies of the offer or request or invitation are first published or sent or given to security holders than such person is bound or willing to take up and pay for, the securities taken up shall be taken up as nearly as may be pro rata, disregarding fractions, according to the number of securities deposited by each depositor. The provisions of this subsection shall also apply to securities deposited within ten days after notice of an increase in the consideration offered to security holders, as described in paragraph (7), is first published or sent or given to security holders.

**(7)** Where any person varies the terms of a tender offer or request or invitation for tenders before the expiration thereof by increasing the consideration offered to holders of such securities, such person shall pay the increased consideration to each security holder whose securities are taken up and paid for pursuant to the tender offer or request or invitation for tenders whether or not such securities have been taken up by such person before the variation of the tender offer or request or invitation.

**(8)** The provisions of this subsection shall not apply to any offer for, or request or invitation for tenders of, any security--

**(A)** if the acquisition of such security, together with all other acquisitions by the same person of securities of the same class during the preceding twelve months, would not exceed 2 per centum of that class;

**(B)** by the issuer of such security; or

**(C)** which the Commission, by rules or regulations or by order, shall exempt from the provisions of this subsection as not entered into for the purpose of, and not having the effect of, changing or influencing the control of the issuer or otherwise as not comprehended within the purposes of this subsection.

**(e) Untrue statement of material fact or omission of fact with respect to tender offer**

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. The Commission shall, for the purposes of this subsection, by rules and regulations define, and prescribe means reasonably designed to prevent, such acts and practices as are fraudulent, deceptive, or manipulative.

**(f) Election or designation of majority of directors of issuer by owner of more than five per centum of class of securities at other than meeting of security holders**

If, pursuant to any arrangement or understanding with the person or persons acquiring securities in a transaction subject to subsection (d) of this section or subsection (d) of section 78m of this title, any persons are to be elected or designated as directors of the issuer, otherwise than at a meeting of security holders, and the persons so elected or designated will constitute a majority

of the directors of the issuer, then, prior to the time any such person takes office as a director, and in accordance with rules and regulations prescribed by the Commission, the issuer shall file with the Commission, and transmit to all holders of record of securities of the issuer who would be entitled to vote at a meeting for election of directors, information substantially equivalent to the information which would be required by subsection (a) or (c) of this section to be transmitted if such person or persons were nominees for election as directors at a meeting of such security holders.

**(g) Filing fees**

**(1)(A)** At the time of filing such preliminary proxy solicitation material as the Commission may require by rule pursuant to subsection (a) of this section that concerns an acquisition, merger, consolidation, or proposed sale or other disposition of substantially all the assets of a company, the person making such filing, other than a company registered under the Investment Company Act of 1940, shall pay to the Commission the following fees:

**(i)** for preliminary proxy solicitation material involving an acquisition, merger, or consolidation, if there is a proposed payment of cash or transfer of securities or property to shareholders, a fee at a rate that, subject to paragraph (4), is equal to $92 per $1,000,000 of such proposed payment, or of the value of such securities or other property proposed to be transferred; and

**(ii)** for preliminary proxy solicitation material involving a proposed sale or other disposition of substantially all of the assets of a company, a fee at a rate that, subject to paragraph (4), is equal to $92 per $1,000,000 of the cash or of the value of any securities or other property proposed to be received upon such sale or disposition.

**(B)** The fee imposed under subparagraph (A) shall be reduced with respect to securities in an amount equal to any fee paid to the Commission with respect to such securities in connection with the proposed transaction under section 77f(b) of this title, or the fee paid under that section shall be reduced in an amount equal to the fee paid to the Commission in connection with such transaction under this subsection. Where two or more companies involved in an acquisition, merger, consolidation, sale, or other disposition of substantially all the assets of a company must file such proxy material with the Commission, each shall pay a proportionate share of such fee.

**(2)** At the time of filing such preliminary information statement as the Commission may require by rule pursuant to subsection (c) of this section, the issuer shall pay to the Commission the same fee as required for preliminary proxy solicitation material under paragraph (1) of this subsection.

**(3)** At the time of filing such statement as the Commission may require by rule pursuant to subsection (d)(1) of this section, the person making the filing shall pay to the Commission a fee at a rate that, subject to paragraph (4), is equal to $92 per $1,000,000 of the aggregate amount of cash or of the value of securities or other property proposed to be offered. The fee shall be reduced with respect to securities in an amount equal to any fee paid with respect to such securities in connection with the proposed transaction under section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)), or the fee paid under that section shall be reduced in an amount equal to the fee paid to the Commission in connection with such transaction under this subsection.

**(4) Annual adjustment**

For each fiscal year, the Commission shall by order adjust the rate required by paragraphs (1) and (3) for such fiscal year to a rate that is equal to the rate (expressed in dollars per million) that is applicable under section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)) for such fiscal year.

**(5) Fee collection**

Fees collected pursuant to this subsection for fiscal year 2012 and each fiscal year thereafter shall be deposited and credited as general revenue of the Treasury and shall not be available for obligation.

**(6) Review; effective date; publication**

In exercising its authority under this subsection, the Commission shall not be required to comply with the provisions of section 553 of Title 5. An adjusted rate prescribed under paragraph (4) shall be published and take effect in accordance with section 6(b) of the Securities Act of 1933 (15 U.S.C. 77f(b)).

**(7) Pro rata application**

The rates per $1,000,000 required by this subsection shall be applied pro rata to amounts and balances of less than $1,000,000.

**(8)** Notwithstanding any other provision of law, the Commission may impose fees, charges, or prices for matters not involving any acquisition, merger, consolidation, sale, or other disposition of assets described in this subsection, as authorized by section 9701 of Title 31, or otherwise.

**(h) Proxy solicitations and tender offers in connection with limited partnership rollup transactions**

**(1) Proxy rules to contain special provisions**

It shall be unlawful for any person to solicit any proxy, consent, or authorization concerning a limited partnership rollup transaction, or to make any tender offer in furtherance of a limited partnership rollup transaction, unless such transaction is conducted in accordance with rules prescribed by the Commission under subsections (a) and (d) as required by this subsection. Such rules shall--

**(A)** permit any holder of a security that is the subject of the proposed limited partnership rollup transaction to engage in preliminary communications for the purpose of determining whether to solicit proxies, consents, or authorizations in opposition to the proposed limited partnership rollup transaction, without regard to whether any such communication would otherwise be considered a solicitation of proxies, and without being required to file soliciting material with the Commission prior to making that determination, except that--

**(i)** nothing in this subparagraph shall be construed to limit the application of any provision of this chapter prohibiting, or reasonably designed to prevent, fraudulent, deceptive, or manipulative acts or practices under this chapter; and

**(ii)** any holder of not less than 5 percent of the outstanding securities that are the subject of the proposed limited partnership rollup transaction who engages in the business of buying and selling limited partnership interests in the

secondary market shall be required to disclose such ownership interests and any potential conflicts of interests in such preliminary communications;

**(B)** require the issuer to provide to holders of the securities that are the subject of the limited partnership rollup transaction such list of the holders of the issuer's securities as the Commission may determine in such form and subject to such terms and conditions as the Commission may specify;

**(C)** prohibit compensating any person soliciting proxies, consents, or authorizations directly from security holders concerning such a limited partnership rollup transaction--

    **(i)** on the basis of whether the solicited proxy, consent, or authorization either approves or disapproves the proposed limited partnership rollup transaction; or

    **(ii)** contingent on the approval, disapproval, or completion of the limited partnership rollup transaction;

**(D)** set forth disclosure requirements for soliciting material distributed in connection with a limited partnership rollup transaction, including requirements for clear, concise, and comprehensible disclosure with respect to--

    **(i)** any changes in the business plan, voting rights, form of ownership interest, or the compensation of the general partner in the proposed limited partnership rollup transaction from each of the original limited partnerships;

    **(ii)** the conflicts of interest, if any, of the general partner;

    **(iii)** whether it is expected that there will be a significant difference between the exchange values of the limited partnerships and the trading price of the securities to be issued in the limited partnership rollup transaction;

    **(iv)** the valuation of the limited partnerships and the method used to determine the value of the interests of the limited partners to be exchanged for the securities in the limited partnership rollup transaction;

    **(v)** the differing risks and effects of the limited partnership rollup transaction for investors in different limited partnerships proposed to be included, and the risks and effects of completing the limited partnership rollup transaction with less than all limited partnerships;

    **(vi)** the statement by the general partner required under subparagraph (E);

    **(vii)** such other matters deemed necessary or appropriate by the Commission;

**(E)** require a statement by the general partner as to whether the proposed limited partnership rollup transaction is fair or unfair to investors in each limited partnership, a discussion of the basis for that conclusion, and an evaluation and a description by the general partner of alternatives to the limited partnership rollup transaction, such as liquidation;

**(F)** provide that, if the general partner or sponsor has obtained any opinion (other than an opinion of counsel), appraisal, or report that is prepared by an outside party and that is materially related to the limited partnership rollup transaction, such soliciting materials shall contain or be accompanied by clear, concise, and comprehensible disclosure with respect to--

    **(i)** the analysis of the transaction, scope of review, preparation of the opinion, and basis for and methods of arriving at conclusions, and any representations and undertakings with respect thereto;

    **(ii)** the identity and qualifications of the person who prepared the opinion, the method of selection of such person, and any material past, existing, or contemplated relationships between the person or any of its affiliates and the general partner, sponsor, successor, or any other affiliate;

    **(iii)** any compensation of the preparer of such opinion, appraisal, or report that is contingent on the transaction's approval or completion; and

    **(iv)** any limitations imposed by the issuer on the access afforded to such preparer to the issuer's personnel, premises, and relevant books and records;

**(G)** provide that, if the general partner or sponsor has obtained any opinion, appraisal, or report as described in subparagraph (F) from any person whose compensation is contingent on the transaction's approval or completion or who has not been given access by the issuer to its personnel and premises and relevant books and records, the general partner or sponsor shall state the reasons therefor;

**(H)** provide that, if the general partner or sponsor has not obtained any opinion on the fairness of the proposed limited partnership rollup transaction to investors in each of the affected partnerships, such soliciting materials shall contain or be accompanied by a statement of such partner's or sponsor's reasons for concluding that such an opinion is not necessary in order to permit the limited partners to make an informed decision on the proposed transaction;

**(I)** require that the soliciting material include a clear, concise, and comprehensible summary of the limited partnership rollup transaction (including a summary of the matters referred to in clauses (i) through (vii) of subparagraph (D) and a summary of the matter referred to in subparagraphs (F), (G), and (H)), with the risks of the limited partnership rollup transaction set forth prominently in the fore part thereof;

**(J)** provide that any solicitation or offering period with respect to any proxy solicitation, tender offer, or information statement in a limited partnership rollup transaction shall be for not less than the lesser of 60 calendar days or the maximum number of days permitted under applicable State law; and

**(K)** contain such other provisions as the Commission determines to be necessary or appropriate for the protection of investors in limited partnership rollup transactions.

**(2) Exemptions**

The Commission may, consistent with the public interest, the protection of investors, and the purposes of this chapter, exempt by rule or order any security or class of securities, any transaction or class of transactions, or any person or class of persons, in whole or in part, conditionally or unconditionally, from the requirements imposed pursuant to paragraph (1) or from the definition contained in paragraph (4).

**(3) Effect on Commission authority**

Nothing in this subsection limits the authority of the Commission under subsection (a) or (d) or any other provision of this chapter or precludes the Commission from imposing, under subsection (a) or (d) or any other provision of this chapter, a remedy or procedure required to be imposed under this subsection.

(4) "Limited partnership rollup transaction" defined

Except as provided in paragraph (5), as used in this subsection, the term "limited partnership rollup transaction" means a transaction involving the combination or reorganization of one or more limited partnerships, directly or indirectly, in which--

**(A)** some or all of the investors in any of such limited partnerships will receive new securities, or securities in another entity, that will be reported under a transaction reporting plan declared effective before December 17, 1993, by the Commission under section 78k-1 of this title;

**(B)** any of the investors' limited partnership securities are not, as of the date of filing, reported under a transaction reporting plan declared effective before December 17, 1993, by the Commission under section 78k-1 of this title;

**(C)** investors in any of the limited partnerships involved in the transaction are subject to a significant adverse change with respect to voting rights, the term of existence of the entity, management compensation, or investment objectives; and

**(D)** any of such investors are not provided an option to receive or retain a security under substantially the same terms and conditions as the original issue.

**(5) Exclusions from definition**

Notwithstanding paragraph (4), the term "limited partnership rollup transaction" does not include--

**(A)** a transaction that involves only a limited partnership or partnerships having an operating policy or practice of retaining cash available for distribution and reinvesting proceeds from the sale, financing, or refinancing of assets in accordance with such criteria as the Commission determines appropriate;

**(B)** a transaction involving only limited partnerships wherein the interests of the limited partners are repurchased, recalled, or exchanged in accordance with the terms of the preexisting limited partnership agreements for securities in an operating company specifically identified at the time of the formation of the original limited partnership;

SPA-31

**(C)** a transaction in which the securities to be issued or exchanged are not required to be and are not registered under the Securities Act of 1933;

**(D)** a transaction that involves only issuers that are not required to register or report under section 78*l* of this title, both before and after the transaction;

**(E)** a transaction, except as the Commission may otherwise provide by rule for the protection of investors, involving the combination or reorganization of one or more limited partnerships in which a non-affiliated party succeeds to the interests of a general partner or sponsor, if--

**(i)** such action is approved by not less than 66 $^2/_3$ percent of the outstanding units of each of the participating limited partnerships; and

**(ii)** as a result of the transaction, the existing general partners will receive only compensation to which they are entitled as expressly provided for in the preexisting limited partnership agreements; or

**(F)** a transaction, except as the Commission may otherwise provide by rule for the protection of investors, in which the securities offered to investors are securities of another entity that are reported under a transaction reporting plan declared effective before December 17, 1993, by the Commission under section 78k-1 of this title, if--

**(i)** such other entity was formed, and such class of securities was reported and regularly traded, not less than 12 months before the date on which soliciting material is mailed to investors; and

**(ii)** the securities of that entity issued to investors in the transaction do not exceed 20 percent of the total outstanding securities of the entity, exclusive of any securities of such class held by or for the account of the entity or a subsidiary of the entity.

**(i) Disclosure of pay versus performance**

The Commission shall, by rule, require each issuer to disclose in any proxy or consent solicitation material for an annual meeting of the shareholders of the issuer a clear description of any compensation required to be disclosed by the issuer under section 229.402 of title 17, Code of Federal Regulations (or any successor thereto), including, for any issuer other than an emerging growth company, information that shows the relationship between executive compensation actually paid and the financial performance of the issuer, taking into account any change in the value of the shares of stock and dividends of the issuer and any distributions. The disclosure under this subsection may include a graphic representation of the information required to be disclosed.

**(j) Disclosure of hedging by employees and directors**

The Commission shall, by rule, require each issuer to disclose in any proxy or consent solicitation material for an annual meeting of the shareholders of the issuer whether any employee or member of the board of directors of the issuer, or any designee of

such employee or member, is permitted to purchase financial instruments (including prepaid variable forward contracts, equity swaps, collars, and exchange funds) that are designed to hedge or offset any decrease in the market value of equity securities--

**(1)** granted to the employee or member of the board of directors by the issuer as part of the compensation of the employee or member of the board of directors; or

**(2)** held, directly or indirectly, by the employee or member of the board of directors.

**(k) Data standards for proxy and consent solicitation materials**

**(1) Requirement**

The Commission shall, by rule, adopt data standards for all information contained in any proxy or consent solicitation material prepared by an issuer for an annual meeting of the shareholders of the issuer, except that the Commission may exempt exhibits, signatures, and certifications from those data standards.

**(2) Consistency**

The data standards required under paragraph (1) shall incorporate, and ensure compatibility with (to the extent feasible), all applicable data standards established in the rules promulgated under section 5334 of Title 12, including, to the extent practicable, by having the characteristics described in clauses (i) through (vi) of subsection (c)(1)(B) of such section 5334 of Title 12.

**CREDIT(S)**

(June 6, 1934, c. 404, Title I, § 14, 48 Stat. 895; Pub.L. 88-467, § 5, Aug. 20, 1964, 78 Stat. 569; Pub.L. 90-439, § 3, July 29, 1968, 82 Stat. 455; Pub.L. 91-567, §§ 3 to 5, Dec. 22, 1970, 84 Stat. 1497; Pub.L. 98-38, § 2(b), June 6, 1983, 97 Stat. 205; Pub.L. 99-222, § 2, Dec. 28, 1985, 99 Stat. 1737; Pub.L. 101-550, Title III, § 302, Nov. 15, 1990, 104 Stat. 2721; Pub.L. 103-202, Title III, § 302(a), Dec. 17, 1993, 107 Stat. 2359; Pub.L. 105-353, Title III, § 301(b)(7), Nov. 3, 1998, 112 Stat. 3236; Pub.L. 107-123, § 6, Jan. 16, 2002, 115 Stat. 2396; Pub.L. 111-203, Title IX, §§ 953(a), 955, 971(a), 991(b)(3), July 21, 2010, 124 Stat. 1903, 1904, 1915, 1953; Pub.L. 112-106, Title I, § 102(a)(2), Apr. 5, 2012, 126 Stat. 309; Pub.L. 117-263, Div. E, Title LVIII, § 5821(g), Dec. 23, 2022, 136 Stat. 3426.)

Notes of Decisions (1312)

15 U.S.C.A. § 78n, 15 USCA § 78n
Current through P.L. 118-41. Some statute sections may be more current, see credits for details.